Josefa Colón, como madre con patria potestad sobre su menor hijo natural reconocido, Alberto Colón, demandante y apelante, *v.* La Sucesión de Don Alberto J. Tristani, compuesta de su heredera declarada Doña Julia Quesada y Mandri Vda. de Tristani, demandada y apelada.

No. 5659.—*Sometido:* Enero 14, 1933. *Resuelto:* Junio 9, 1933.

*R. Atiles Moreu* y *Erasto Arjona Siaca,* abogados de la apelante; *José A. Poventud* y *Alberto S. Poventud,* abogados de la apelada.

El Juez Asociado Señor Córdova Dávila, emitió la opinión del tribunal.

La demandada solicita la reconsideración de nuestra sentencia. Se alega en primer término que incurrimos en error al estimar admisible y considerar el testimonio de Josefa Colón, madre de Alberto Colón, relativa a transacciones, actos y manifestaciones de Alberto J. Tristani, padre putativo de dicho menor.

Arguye la demandada, por conducto de sus ilustra-

dos abogados, que la Legislatura de Puerto Rico, en marzo 10 de 1904, procedió a remover, al igual que en otras jurisdicciones, las causas de inhabilitación para declarar por motivo de interés en un juicio o procedimiento, pero a la vez estableció una prohibición contra las partes para declarar en lo referente a manifestaciones o transacciones con un finado en acciones contra los herederos de éste, a menos que fueren llamados a declarar por la parte contraria, decretando así la subsistencia de este último caso de inhabilitación con el precepto que extinguió el interés en el litigio como impedimento para ser testigo. La disposición legislativa a que se refiere la demandada está comprendida en la ley para prescribir quiénes son testigos hábiles y para derogar el artículo 1215 del Código Civil, aprobada en 1904, cuyo artículo tercero dice así:

"En las demandas por o en contra de los albaceas testamentarios, administradores o tutores en las cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, o relaciones hechas por el testador, intestado o pupilo, a menos que fuere llamado a declarar por la parte contraria; y las prescripciones de esta sección se aplicarán a todas las demandas por o en contra de los herederos y representantes legales de un finado, que se suscitaren de transacciones habidas con éste."

Alega la demandada que de acuerdo con el artículo que acabamos de transcribir, no ha debido admitirse la declaración de Josefa Colón, y en apoyo de su contención copia de la opinión emitida en el caso de *Morales* v. *Sucn. Cerame*, 30 D.P.R. 843, la última parte de un párrafo que nosotros nos permitimos transcribir en toda su integridad, ya que la parte suprimida tiene alguna pertinencia con este caso en que el menor Alberto Colón era un niño de seis años de edad cuando se promovió esta acción:

"Además, el padre ha muerto y no hace muchos años que murió. El hijo tuvo oportunidades durante la vida de su padre para haber establecido esta acción. Las cortes examinarán con cuidado la prueba en tales circunstancias cuando la persona más interesada no puede ser

oída. El caso es algo distinto cuando el hijo tiene pocos años al ocurrir el fallecimiento del padre. No sólo son escrupulosas las cortes sino que la legislatura ha reconocido los peligros que hay en casos semejantes con esta clase de prueba. El artículo 3 de la ley de 1904 prescribe, entre otras cosas, que 'en las demandas por o en contra de los albaceas testamentarios, administradores o tutores en las cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, o relaciones hechas por el testador, intestado o pupilo, a menos que fuere llamado a declarar por la parte contraria.''

No se trata en este caso de una reclamación contra los bienes de la herencia de Alberto J. Tristani basada en transacciones o negociaciones con el referido finado. Se ejercita una acción de filiación para cuya prueba no puede aportarse evidencia alguna con respecto a los bienes, porque resultaría completamente impertinente. Una vez establecida la filiación, la persona declarada hijo natural tendrá todos los derechos que la ley le concede; pero esto no cambia en modo alguno la naturaleza de la acción ni requiere otra prueba que aquella que tienda a establecer la condición de hijo natural que es el propósito fundamental que se persigue.

Admitimos que la ley citada por la demandada está en vigor, como una de las excepciones a la regla general, y sostenemos que esta excepción debe aplicarse dentro de las limitaciones que la misma ley impone sin extenderla a casos que no se relacionan directamente con transacciones o negociaciones de un finado sobre sus bienes. En los Estados Unidos prevalece en la mayoría de las jurisdicciones el mismo principio que de acuerdo con la ley de 1904 está en vigor en Puerto Rico. En el Estado de Arizona, por ejemplo, el artículo 4212 de los Estatutos Revisados establece la excepción en la siguiente forma:

''Disponiéndose que en acciones o procedimientos por o en contra de los albaceas testamentarios, administradores o tutores, en los cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con o relaciones hechas por el testador, intestado o pupilo, a menos que sea llamado a declarar por la parte contraria.''

Es prácticamente la misma excepción establecida en Puerto Rico, y así por el estilo, con algunas variantes, son las demás excepciones en vigor en los estados que han adoptado el mismo principio.

Esta excepción a la regla general ha sido severamente criticada por Wigmore y otras autoridades, aun cuando se aplique dentro de sus propios límites. El eminente comentarista expone los argumentos que se han utilizado hasta la fecha en favor de la excepción, los cuales califica de superficiales y aduce los suyos propios, para demostrar que a su juicio la excepción establecida no se basa en una sólida y sana argumentación. Veamos lo que nos dice el ilustre comentarista en la página 1004 del tomo primero de su obra sobre "Evidencia", segunda edición:

"En casi todas las jurisdicciones de los Estados Unidos, en virtud de estatutos aprobados al abolirse o algún tiempo después de abolirse la incapacidad general de los testigos motivada por interés, se estableció una excepción a la vieja regla de incapacidad, que ha permitido perpetuar, dentro de una reducida esfera, el principio de la regla descartada. La limitación de esta moderna regla excluye el testimonio del superviviente de una transacción con un finado, cuando se ofrece contra los bienes del último.

"No aparece ningún precedente que pueda haber servido como ejemplo y la casi universal costumbre de este moderno fragmento de la vieja anomalía es por lo tanto más curiosa.

"Los defensores de esta regla usualmente se contentan con invocar alguna vaga metáfora en lugar de una razón, pero ocasionalmente tropezamos con una tentativa de justificación razonable:

"1873, Brickell, J., en Louis v. Easton, 50 Ala. 471: 'Este derecho y privilegio (de testificar) debe ser mutuo. No puede existir en una parte y no en la otra. Si la muerte ha cerrado los labios de una parte la política de la ley es cerrar los labios de la otra.'

"1878, Haymond, J., en Owens v. Owens, 14 W. Va. 88, 95: 'La ley en la excepción al privilegio para testificar tuvo la intención de evitar una ventaja indebida por parte del superviviente sobre el finado, que no puede carearse con dicho superviviente, u ofrecer su versión del asunto, o exponer la omisión, equivocación o quizá falsedades de tal superviviente. La tentación a la falsedad y a la ocultación en tales casos se considera demasiado grande para permitir a

la parte superviviente que testifique en su propio favor. Cualquier otro aspecto de este asunto, creo, colocaría en gran peligro los bienes del finado y los convertiría en presa fácil de una persona deshonesta y sin escrúpulos.'

"El argumento del último pasaje de que una regla contraria 'colocaría en gran peligro los bienes del finado', suficientemente caracteriza el razonamiento superficial en que la regla descansa. ¿No son los bienes de los supervivientes colocados en peligro por la presente regla, que prohibe evidencia en muchas legítimas reclamaciones? ¿Puede ser más importante salvar los bienes del muerto de falsas reclamaciones que salvar de que se pierdan por carencia de prueba los bienes de las personas que viven?

"La verdad es que la presente regla está abierta casi en el mismo grado a cualquiera de las objeciones que fueron urgidas con éxito hace cerca de una centuria contra la regla general de la incapacidad motivada por interés. Aquellas objeciones pueden ser reducidas a cuatro: (1) Que el supuesto peligro de que las personas interesadas testifiquen falsamente existe solamente en una limitada extensión. (2) Que aun así, en tanto en cuanto ellos testifiquen la verdad, la exclusión constituye una intolerable injusticia. (3) Que ninguna exclusión puede ser definida como racional, consistente y viable. (4) Que en todo caso el arma de la repregunta y otros medios para descubrir la verdad constituyen una suficiente garantía contra frecuentes falsas decisiones. Cada una de las tres primeras objeciones se aplican a la presente regla con tanta amplitud como a la vieja. La cuarta se aplica con más aparente fuerza, porque el testimonio de la parte contraria se produce sin contradicción. Y sin embargo, ¡cuán inconsistente resulta aun el apoyo de esta regla! Porque sus defensores declaran en efecto la ausencia de oposición al testimonio la única razón para adoptar una excepción a aquella situación particular; y sin embargo puesto que el finado es la parte contraria, él vendría a ser hipotéticamente un mentiroso al igual que el superviviente incapacitado; de modo que la regla descansa en la supuesta ausencia de una cuestionable especie de testimonio que resulta tan débil como la regla que se excluye. Nunca hubo y nunca habrá una exclusión por motivo de interés que pueda ser definida como lógica o prácticamente sana. Añádanse a esto las distinciones confusas creadas en la aplicación de los complicados estatutos que definen esta regla, y el resultado es una masa de vanas trivialidades que no tienen la más pequeña relación con la veracidad del testigo.

"1895, Corliss, J., St. John v. Lofland, 5 N. D. 140, 64 N. W. 930: 'Los estatutos que excluyen testimonio por este motivo son de

dudosa conveniencia. Son más las reclamaciones legítimas que fracasan, debido a la supresión de esta prueba, que las ficticias que podrían establecerse si estas excepciones fuesen derogadas y se declarase que toda persona es competente para testificar. Asumir que en tal evento muchas reclamaciones falsas serían establecidas por medio del perjurio, es formar un concepto muy bajo de la naturaleza humana y exagerar las proporciones de la inventiva y habilidad humanas. Quien no posee otra evidencia para probar su caso que la que el estatuto declara incompetente, carece de remedio; pero aquéllos contra quienes se dirija una demanda deshonesta no quedarán completamente sin protección por el hecho de que la muerte haya sellado los labios de la única persona que pueda contradecir al testigo superviviente que respalda su reclamación con su juramento. En el arsenal de la legalidad hay un arma cuyas repetidas estocadas será difícil y en muchas ocasiones casi imposible esquivar por dicho superviviente, si su testimonio es una red de falsedades: la espada de la repregunta. Por estas razones que surgen de la faz de esta regla de conducta (*question of policy*) nosotros estimamos que es una regla saludable que debe ser aplicada en la interpretación de estatutos del carácter del que ahora nos ocupa, que estos estatutos no deben extenderse más allá de su letra cuando el efecto de tal extensión equivalga a aumentar la lista de aquéllos a quienes la ley declara incompetentes como testigos.'

"1921, Henry W. Taft, en '*Comments on Will Contests in New York,*' Yale Law Journal, XXX, 593, 605; 'Esta restricción frecuentemente ocasiona intolerables injusticias evitando el establecimiento de una reclamación meritoria. Además, ha sido aplicada con rigurosa exactitud y ha dado origen a un laberinto de decisiones sutiles. Una larga experiencia me conduce a creer que los males que se originan no justifican la retención de la regla. En los tempranos días de nuestra jurisprudencia se excluía el testimonio de los testigos interesados, pero la experiencia gradualmente condujo a la conclusión de que la restricción debía ser liberalizada, depositando mayor confianza en la eficacia de nuestros medios para investigar la verdad. La repregunta, por ejemplo, se ha considerado bastante para descubrir cualquier combinación fraudulenta tramada por una parte interesada y cuando ésta ha fracasado, el escrutinio a que el testimonio del testigo queda sujeto por la corte y por el jurado, ha sido eficaz para descubrir la verdad, amén del poder de la evidencia circunstancial para desacreditar las simples manifestaciones orales de un testigo interesado.'

"Como una cuestión de conducta (*policy*) esta supervivencia de

la descartada incapacidad por motivos de interés, es deplorable en todos sentidos; porque se basa en un principio falaz y desacreditado, conduce a tantas o más falsas decisiones que las que evita, y dificulta la profesión con una masa profusa de vanos subterfugios sobre la interpretación de meras palabras.

"Si alguna concesión ha de hacerse a las consideraciones de cautela que inspira la regla, hay tres simples caminos a seguir, los cuales se vienen utilizando, y cada uno de ellos es capaz de realizar el propósito sin seguir el crudo, técnico e injusto método de incapacitar testigos supervivientes. Uno de ellos, adoptado en Arizona, Nuevo Méjico y Canadá, es no permitir recobrar a la parte en tales casos cuando sólo se produce su testimonio sin ninguna clase de corroboración. El segundo, seguido en Connecticut, Virginia y Oregon, es admitir a la parte superviviente, y en igual sentido cualquier escrito o declaración del finado sobre la cuestión controvertida. El tercero, inventado en New Hampshire y seguido en Arizona, es excluir el testimonio, excepto cuando 'aparece a la Corte que se cometería una injusticia excluyéndolo.' Esto elimina el aspecto arbitrario de la regla y le presta flexibilidad."

Es claro y evidente que la excepción que establece la ley de 1904 no cubre las acciones de filiación. Esta excepción debe mantenerse dentro de sus propios límites, sin ampliar su esfera de acción. En nuestro caso el testimonio de la demandante ha sido corroborado por prueba abundante y no hay razón alguna que justifique su eliminación, ni podría hacerse tampoco, porque nuestra Ley de Evidencia no autoriza semejante exclusión.

Los ilustrados abogados de la demandada alegan que la jurisprudencia americana con respecto al testimonio de la madre no es aplicable al territorio de Puerto Rico, por la razón de que aquí impera desde 1904 el estatuto antes referido que inhabilita a una parte para declarar contra los herederos de otra fallecida a menos que sea llamada para testificar por la parte adversa. Ya hemos dicho que esta prohibición no es aplicable al presente caso. Citamos en nuestra opinión la jurisprudencia americana únicamente para demostrar que el testimonio de la madre es admisible en los estados de la Unión donde las leyes de evidencia son similares a la

nuestra. Mencionamos el caso de *Mitchell* v. *State*, 57 Ind. A. 520, 108, N. E. 175, para demostrar la liberalidad a que se ha llegado en el continente, sin que esto quiera decir que aceptemos que la manifestación aislada de la madre sobre la paternidad del hijo sea bastante para que recaiga una declaración de hijo natural. Este es un elemento de prueba que debe tenerse en cuenta en unión de otros actos para llegar a esta conclusión. Y queremos añadir aquí que si nos limitamos a citar el caso de Indiana fué únicamente para presentarlo como un ejemplo, porque abundan los casos que sostienen que el testimonio de la madre, sin corroboración, es bastante para una declaración de paternidad, así como está sostenido por el peso de las autoridades que estos procedimientos, siendo civiles por su naturaleza, se rigen por las reglas de evidencia que se aplican en casos civiles, pudiendo probarse la paternidad del niño por una preponderancia del testimonio y sin que sea necesaria una certeza moral o que se establezca la misma fuera de duda razonable. Esta prueba es necesaria cuando el procedimiento es considerado criminal en su naturaleza. *State* v. *Reese,* 135 Pac. 271; *State* v. *Brunette,* 150 N. W. 271; *Commissioner of Public Charities of New York* v. *Vassie,* 167 App. Div. 75; *State* v. *Law,* 144 Pac. 232; *Brantley* v. *State,* 65 So. 679, 7 C. J., pág. 995, párrafo 128, y numerosos casos citados.

Wigmore, en el tomo segundo, página 1339, párrafo 1141, de su obra sobre "Evidencia", primera Ed., dice que en un tiempo en que las partes y personas interesadas estaban incapacitadas para declarar, se estableció por estatuto, en varias comunidades coloniales, una excepción basada probablemente en una práctica vieja y tradicional, permitiendo a la madre servir de testigo "in a prosecution for bastardy or suit for filiation", siempre que se demostrase previamente que durante las horas del parto había señalado como padre a la misma persona sometida a juicio después. Naturalmente, una vez abolida la incapacidad motivada por interés, la madre pudo declarar, sin depender su admisión del requisito de estas manifesta-

ciones previas, que constituían una excepción a la regla que prohibe prueba de referencia, y que muy pocos estados admiten hoy, por disposición legislativa, basados más bien en la teoría que permite declaraciones en peligro de muerte. Generalmente, en ausencia de estatuto, la evidencia es inadmisible. En Massachusetts, por ejemplo, las manifestaciones de la madre durante el parto son admisibles en corroboración de su testimonio.

Dedica la demandada algunas páginas de su alegato a discutir la prueba, y entiende que de acuerdo con la misma ha debido confirmarse la sentencia apelada. No creemos necesario repetir los argumentos y conclusiones que aparecen en nuestra opinión, donde esta cuestión fué objeto de un estudio detenido y minucioso. Sí queremos hacer constar que citamos el testimonio de Petrona Suárez porque la corte inferior lo tuvo en consideración al dictar su fallo, a pesar de que, aun en el caso de que Josefa Colón hubiese tenido un hijo en Nueva York, el hecho en todo caso ocurrió años después de haber sido engendrado Alberto Colón. Dijimos entonces y repetimos ahora que la declaración de la testigo mencionada no justifica la conclusión categórica de la corte inferior. En cuanto a la prueba pericial, entiende la demandada que hemos debido devolver el caso a la corte inferior para darle oportunidad de emitir su juicio sobre la misma. Dada la naturaleza de esta prueba, opinamos que podemos apreciarla sin necesidad de que la corte inferior haya emitido un juicio previo sobre ella. Además, al dictar nuestro fallo nos hemos ajustado al artículo 306 del Código de Enjuiciamiento Civil, según el cual cuando se revocare la sentencia, orden o decreto del tribunal inferior, esta corte procederá a pronunciar la sentencia, orden o decreto que debió haber dictado el tribunal inferior, salvo los casos en que fuere necesario aclarar determinados puntos de hecho, o que la indemnización que hubiere de fijarse o materia sobre la cual hubiere de decretarse, fuere dudosa, pues en cualquiera de estos casos se devolverá la causa para su revisión al tribunal inferior. No surge de la

prueba pericial la necesidad de aclarar ningún determinado punto de hecho, y por lo tanto actuamos de acuerdo con la ley al dictar nuestro fallo, sin devolver el caso a la corte sentenciadora.

■ Alega la demandada que incurrimos en error al declarar que la investigación de la paternidad se encuentra autorizada en Puerto Rico, después de la enmienda al Código Civil en 1911. Creemos haber demostrado claramente que la madre no está incapacitada para declarar como testigo, de acuerdo con nuestra Ley de Evidencia. La enmienda al Código Civil en 1911 no tiene el alcance que lè atribuye la demandada. Según Scaevola, el Código Español, inspirándose en los antecedentes nacionales, no prohibe expresamente la investigación de la paternidad, pero tampoco la autoriza, puesto que lo que hace es permitir la declaración judicial de la misma, cuando consta ya extrajudicialmente, como se desprende de los casos primero y segundo del artículo 135. Scaevola, Comentarios al Código Civil, tomo 3°., página 181. Sin embargo, la ley de bases, en su sección quinta, expresamente dice que no se admitirá la investigación de la paternidad. No hay duda alguna de que ésta fué la intención del legislador y así ha sido interpretada la ley por la jurisprudencia española. Vino luego la abolición de la incapacidad para declarar motivada por interés, que disipó toda duda con respecto al derecho de la madre para servir como testigo en casos de filiación. La enmienda de 1911 debe interpretarse como si originalmente hubiese sido aprobada por nuestra Legislatura, sin que tengamos que atenernos a la base quinta, que explica y aclara el alcance del artículo 135 del Código Civil Español.

El artículo 189 del Código Civil, tal y como fué aprobado en 1902, se apartó del Código Civil Español, introduciendo modificaciones transcendentales. Este artículo, en su inciso segundo, obligaba al padre a reconocer al hijo ilegítimo cuando pública o privadamente le tuviese por hijo suyo o le hubiese llamado tal en conversación, o se ocupase de su educación y sostenimiento, y la enmienda de 1911, incorporada en el ar-

tículo 193, impone al padre la misma obligación cuando el hijo se halla en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia. En lo que respecta a la investigación de la paternidad, ambas disposiciones surten el mismo efecto. Los requisitos exigidos en 1902 son elementos de prueba que sirven para demostrar la posesión de estado exigida en 1911.

Confiesan los ilustrados abogados de la parte demandada que el inciso segundo del expresado artículo 189, al establecer el reconocimiento tácito como causa bastante para imponer al padre la obligación de reconocer, y tal vez al permitirse prueba de las relaciones amorosas entre los padres por el inciso tercero, autorizó la investigación de la paternidad, ya que lo primero amplió el derecho de los hijos ilegítimos tanto como lo hiciera la Ley 11 de Toro; y como en esta última, el Código Civil de 1902 permitió prueba de actos de reconomiento tácito o privado.

Las modificaciones transcendentales que sufrió nuestra legislación en 1902 con respecto a los hijos naturales, rompieron el nexo que existía entre nuestro Código Civil y el Código Civil Español, en lo que a esta importantísima cuestión se refiere.

El artículo 193, como muy bien dice Scaevola, comentando su equivalente del Código Civil Español, no prohibe expresamente ni tampoco autoriza la investigación de la paternidad, ni puede interpretarse en el sentido de haber derogado nuestra Ley de Evidencia que declara que todas las personas sin excepción podrán declarar como testigos, fuera de los casos especificados en los artículos 39 y 40. Este último artículo determina los casos en que no se podrá examinar a una persona como testigo, y entre estos casos no está comprendida la investigación de la paternidad mediante el testimonio de la madre.

Además, el inciso tercero del artículo 189 en 1902, lo mismo que el inciso tercero del artículo 193 en 1911, obligan al padre a reconocer al hijo natural cuando la madre fué cono-

cida viviendo en concubinato con el padre durante el embarazo o al tiempo del nacimiento del hijo en el primer caso, y durante el embarazo y al tiempo del nacimiento del hijo en el segundo. Sostenemos que el concubinato no puede establecerse sin que se pruebe la convivencia íntima de la madre con el padre putativo. No se establece el concubinato probando únicamente que varón y mujer viven en una misma casa; es necesario añadir las relaciones sexuales, y si se trata de una acción de filiación, debe probarse que estas relaciones existían durante el embarazo y al tiempo del nacimiento del hijo. El concubinato no puede confundirse con el matrimonio en lo que respecta a la prueba mediante la cual se establece la intimidad de las relaciones. En el matrimonio la convivencia íntima de los cónyuges surge de la prueba del mismo mediante el acta matrimonial; en el concubinato, la conclusión de su existencia surge de los hechos, es decir, de esa convivencia íntima entre varón y mujer. Son los hechos los que establecen el concubinato. La convivencia y las relaciones sexuales no se presumen. No existe documento alguno para probarlas; es necesario ofrecer los hechos, y cuando éstos quedan establecidos, es que surge la conclusión de concubinato.

Hemos dicho que establecidas las relaciones sexuales del padre putativo con la madre surge una presunción moral tan difícil de rebatir como en los casos de concubinato. Desde luego que al expresarnos en estos términos nos referimos únicamente al hecho de la paternidad como un elemento de prueba para establecer las condiciones de hijo natural. La investigación de la paternidad no tiene por objeto establecer *a priori* una presunción legal como en el caso del matrimonio, sino facilitar al hijo los medios de demostrar su filiación para que recaiga sobre la misma un pronunciamiento judicial. La prueba no debe limitarse y concretarse a descubrir quién fué el progenitor. Este no es más que un elemento probatorio que debe tomarse en cuenta en unión de otros actos, para establecer la condición de hijo natural. No hemos equiparado

las relaciones de un hombre con su querida al estado de concubinato. Si así fuera, habríamos basado simplemente nuestra sentencia en las conclusiones de la corte inferior que declara probado que Josefa Colón fué la querida de Alberto J. Tristani, sin necesidad de ninguna argumentación. Nos habría bastado con decir que establecida la relación que considera probada la corte *a quo,* quedaba también establecida la condición de hijo natural del niño Alberto Colón. Por el contrario hemos dicho y creemos haberlo hecho con toda claridad, que esta prueba, robustecida y corroborada por otros actos del padre, puede ser suficiente para que se obtenga y recaiga una declaración de hijo natural.

Copiamos, para terminar, uno de los últimos párrafos de nuestra opinión:

"Acaso nos hemos extendido demasiado en el examen y la relación de la prueba. Creemos, sin embargo, que era necesario hacerlo así, dada la naturaleza del caso y las conclusiones establecidas por la corte inferior. Opinamos que la filiación de Alberto Colón ha quedado satisfactoriamente establecida. La corte *a quo* declara probado que Josefa Colón era la querida de Alberto Tristani allá por los años de 1922 a 1924, o sea durante el tiempo en que fué concebido el niño Alberto Colón. Declara además la corte *a quo* que Tristani visitaba con alguna frecuencia a Josefa Colón por la noche, que le daba dinero y pagaba la casa en unión del Sr. Fortier; que Tristani pagó los honorarios de la comadrona que asistió a Josefa Colón en su alumbramiento y que realizó algunos actos aislados de cariño hacia el menor Alberto Colón. La corte inferior nada dice sobre la casa que Alberto Tristani compró a Josefa Colón. La declaración del vendedor de esta casa, Emilio Márquez, no aparece contradicha y produce la impresión de ser un testimonio desinteresado. Este testigo declara que Alberto Tristani, cuando le pagó la casa, le dijo que tenía un hijito con Josefa Colón. La demandante declaró también que al niño se le puso el nombre de Alberto porque 'el papá dijo que se le pusiera ese nombre.' Estos hechos, unidos a los demás detalles y circunstancias diseminados en la prueba, nos parecen bastantes para declarar a Alberto Colón hijo natural reconocido de Alberto Tristani."

*No ha lugar a la reconsideración solicitada.*

Los Jueces Asociados Señores Wolf y Aldrey, disintieron.*

---

*.Nota: Véase el prefacio.