ROSALÍA SÁNCHEZ, ET ALS., demandantes, apelantes y apelados, v. MARGARITA SÁNCHEZ, ET ALS., demandados, apelados y apelantes. LOS MISMOS, demandantes, apelados y apelantes, v. LOS MISMOS, demandados, apelantes y apelados.

Núms. 7478 y 7479.—*Sometidos:* Febrero 6, 1941. *Resueltos:* Abril 30, 1941.

*Arturo Aponte*, abogado de los demandantes, apelantes y apelados; *Joaquín Vendrell*, abogado de los demandados, apelados y apelantes.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Se trata de un solo pleito. Contra la sentencia dictada en el mismo apelaron los demandantes y también, separadamente, los demandados, pero los alegatos presentados son comunes a ambos recursos. Comenzaremos nuestro estudio por el interpuesto por los demandados.

El pleito surgió en el seno de una familia. Cuatro hermanos vivos y trece hijos de cuatro fallecidos demandan a seis hijos de otro hermano en reclamación de condominios, arreglo de cuentas y abono y distribución de frutos, todo en relación con cierta finca urbana, único bien que heredaron de su causante doña Juana Montañez viuda de Sánchez.

Alegaron los demandantes que doña Juana fué dueña hasta la hora de su muerte ocurrida el 4 de mayo de 1923 de dicha finca consistente en solar de diez y seis metros de frente por diez y siete de fondo en la calle de Santa Rosa de la ciudad de Humacao, con casa de mampostería techada de

zinc de doce metros de frente por diez y siete de fondo con horno de cocer pan y dedicada a panadería.

Que años antes de morir, doña Juana tomó a préstamo a Wifredo Bertrán dos mil dólares que garantizó con hipoteca sobre la finca, hipoteca que quedó inscrita finalmente a favor de la viuda de Bertrán, Margarita Picornell, y que vencida la deuda, muerta ya doña Juana, la acreedora procedió a su cobro por la vía judicial, señalándose el 28 de diciembre de 1929 para la venta en pública subasta de la finca hipotecada.

Que el aquí demandante Félix Sánchez y Esteban Sánchez, causante de los aquí demandados, se comunicaron con los otros herederos de doña Juana y acordaron que se rematara la finca adjudicándose bien a Félix, ya a Esteban, por dos mil quinientos dólares a que ascendía el crédito con sus intereses y costas, suma que aportarían Félix mil y Esteban mil quinientos, conviniéndose en que el adjudicatario traspasaría luego la finca a todos los herederos deduciendo las aportaciones, y que en efecto la finca fué rematada y adjudicada, bajo las estipulaciones indicadas, a Esteban.

Que ya adjudicada la finca a Esteban, se convino en que Félix y Esteban retendrían la finca mediante el canon de cien dólares mensuales con el que amortizarían los dos mil quinientos que habían aportado, después de lo cual se procedería a repartir los bienes entre todos los herederos, y que cuando se estaba preparando la finca para utilizarla y cobrarse de ella los hermanos Félix y Esteban, enfermó éste súbitamente, y murió en mayo 8, 1930, sin que se llevara a efecto el convenio, quedando la finca a disposición de los interesados, y que no obstante constar a los demandados, herederos de Esteban, la verdad de todo lo ocurrido, tomaron posesión material del inmueble el 26 de enero de 1931, alegando ser dueños absolutos del mismo, habiendo arrendado una parte de él, cobrando las rentas y negándose a distribuirlas y a proceder a la división del fundo—que tiene un valor de ocho mil dólares—entre ellos y los demandantes.

Los demandados excepcionaron la demanda por ininteligible y dudosa. Su excepción fué declarada sin lugar y contestaron. En resumen, negaron que la adjudicación de la finca a su causante se hiciera bajo convenio alguno y alegaron que son dueños absolutos por herencia de su padre Esteban de la finca en cuestión.

Fué el pleito a juicio y la corte lo resolvió por sentencia que contiene los siguientes pronunciamientos: 1, que la casa objeto del litigio pertenece en común pro indiviso a demandantes y demandados, en la proporción que a cada uno corresponda como herederos de Juana Montañez viuda de Sánchez; 2, que todos los herederos adeudan, en proporción de sus derechos, los dineros que aportaron dos de ellos, Félix Sánchez, mil dólares, y Esteban Sánchez, mil quinientos dólares, y sus intereses legales desde diciembre 28, 1929, fecha de la subasta de la casa en cuestión; 3, que corresponde a demandantes y demandados todo lo que haya producido la casa desde enero 24, 1931, en que tomó posesión de ella la sucesión demandada, y también lo producido desde la fecha del remate hasta la de la toma de posesión. De esos productos se pagarán los créditos de Félix y Esteban, y el sobrante será de los herederos en la proporción que les corresponda como tales, y 4, que las costas del litigio incluyendo una cantidad razonable para honorarios de abogado sean pagadas por los demandados.

Señálanse en el alegato once errores atribuídos a la corte sentenciadora, los tres primeros al permitir declarar a los testigos González Fagundo, López del Valle e Ignacio de Jesús sobre manifestaciones héchasles por dos de los demandantes y sobre transacciones habidas con el difunto causante de los demandados; el cuarto por negarse a eliminar dichas declaraciones; el quinto, el sexto, el séptimo y el octavo por haber permitido declarar a los testigos Agustín Díaz, Félix Sánchez y Rafael Mas sobre las dichas manifestaciones y transacciones y al último sobre la forma del pago de las contribuciones de la finca en litigio; el noveno al apreciar la

prueba actuando con pasión, prejuicio y parcialidad; el décimo al dictar sentencia a sabiendas de que una de las demandantes había fallecido, y el undécimo al imponerles las costas y honorarios de abogado.

El octavo señalamiento de error no se discute por los apelantes en su alegato. Los siete primeros se argumentan conjuntamente y así procederemos a su estudio, comenzando por exponer lo sucedido en cada ocasión separadamente.

▮ Francisco González Fagundo, abogado y notario, dijo que conoció a Esteban Sánchez y conoce a Margarita Sánchez y que tuvo y tiene con ellos íntima amistad; que antes de la subasta de la casa tuvo una entrevista con Félix, Esteban y Manuel Sánchez con el fin de conseguir dinero para la subasta; que Esteban le vendió una casa en mil dólares a Providencia Ramírez.

Se opuso el abogado de los demandados por ser inmaterial lo de la venta. Argumentó extensamente el abogado de los demandantes. La corte resolvió que el testigo podía declarar. Tomaron excepción los demandados.

Siguió diciendo que Félix Sánchez tenía unos pagarés hipotecarios y los negoció para levantar fondos, mil dólares. Se opusieron los demandados por no haberse probado aún el convenio alegado en la demanda y la corte admitió la evidencia con su objeción.

Continuó refiriendo que el día de la subasta estuvieron previamente en su oficina Félix, Esteban y Manuel Sánchez y discutieron sobre cuál de ellos adquiriría la finca, acordándose de primera intención que fuera Manuel que era soltero y no tenía deudas pero luego cambiaron de opinión y lo hizo Esteban.

"P.—En la conversación que tuvieron, ¿usted sabe si la finca iba a sacarla Esteban Sánchez para don Esteban Sánchez o para otras personas?

"R.—Para todos; para el conjunto.

"P.—¿Para la sucesión entera?

"R.—Sí, señor.

"P.—¿La sucesión de quién?

"R.—De doña Juana Montañez.

"Lic. Vendrell: Nos oponemos a todo esto se está entrando al testigo en un campo muy distinto.

"Testigo: Con el buen entendido de que habría de reintegrarle a don Félix su dinero y a don Esteban por igual.

"Lic. Vendrell: Todo esto es inmaterial.

"Hon. Juez: ¿Se opone a esta declaración, o sea a que era para la comunidad, reconociendo los derechos de cada uno en cuanto a la cuantía aportada por cada uno de ellos?

"Lic. Vendrell: Nosotros estamos alegando que es inmaterial porque el testigo está declarando sobre ciertos extremos que no guardan relación con los hechos alegados en la demanda.

"Hon. Juez: La corte apreciará la evidencia ahora y en conjunto luego.

"Lic. Vendrell: Con nuestra excepción."

Llamado José López del Valle, abogado, registrador de la propiedad, amigo íntimo de ambas partes y hermano político del demandante Félix, dijo que se enteró de los pasos que daban Esteban y Félix para buscar dinero para pagar la hipoteca; que consultaron con él y les aconsejó que "para evitarse el trámite de la mar de declaraciones de herederos por tratarse de una sucesión muy larga . . . continuasen la ejecución . . . y en el remate la sacara uno de ellos dos y luego el que la sacara" la repartiera entre todos.

Los demandados objetaron la prueba "por ser inmaterial y además de referencia." La corte admitió la evidencia y los demandados tomaron excepción.

Continuó declarando que "sacó un momentito" y fué a la subasta y allí "Esteban Sánchez me dice: 'Oye, Pepe, ¿no es lo mismo que se ponga la casa a nombre mío?' Y yo le dije: 'Creo que para ustedes es lo mismo.' Llamé a Félix y le dije: 'Dice Esteban que se ponga la casa a nombre de él', y Félix dijo: 'Lo mismo da que se ponga a nombre de él.' Que sabe del dinero que se pagó en la subasta porque estuvo en el acto de la misma hasta que se terminó; que Esteban Sánchez pagó $2,500; que no sabe cómo se aportó ese dinero; que el testigo no tuvo intervención en el di-

nero. . . . . . Que el convenio fué . . . que después que se le adjudicara a uno de ellos, que con la renta que produjera la casa, para ellos no gravarse, ellos tomarían posesión de la finca en arrendamiento y con la renta de la casa ellos se cobrarían; Esteban Sánchez cobraría sus $1,500 y Félix Sánchez $1,000 y después que la finca estuviera limpia, que no se debiera nada, entonces repartirla en la parte proporcional que le correspondía a cada uno. Que la finca se iba a repartir entre los nueve herederos de doña Juana Montañez.''

Los demandados, por su abogado, sin objetar la última parte de la declaración del testigo, lo represuntaron obteniendo las siguientes contestaciones:

''Que las manifestaciones con respecto a la forma en que se iba a adjudicar el inmueble fueron hechas en distintos sitios; la primera vez que estuvieron considerando lo que querían hacer fué en la oficina del testigo pero que estuvieron los dos a consultar al testigo si no había peligro al hacer eso y yo le dije negativamente que no había peligro en que se adjudicara a uno de los dos la posesión de la finca; que el testigo no le aconsejó que hicieran constar todo eso en algún documento público, porque no tenía conocimiento, que entre los dos hubiera ocurrido algo con estos familiares; que el testigo tenía conocimiento de los que componían la sucesión con todas sus estirpes.

''P.—¿Usted tenía conocimiento de si el convenio había llegado a conocimiento de ellos también?

''C.—¿De quién?

''P.—De todos los demás, con excepción de Félix y Esteban Sánchez.

''C.—Y Manuel que estaba con ellos y ellos hablaban en nombre de todos.

''Que como lo que se iba a hacer era para beneficio de todos ellos no creía necesario hacer constar el convenio en documento alguno, no obstante existir una sucesión tan numerosa con sus respectivas estirpes; . . . . . . . P.—¿De modo que buenamente ellos se prestaban a dar mil dólares el uno y mil quinientos el otro para proteger el inmueble en beneficio de los demás interesados?—R.—En beneficio de ellos como hermanos y sobre lo que les correspondía a todos los familiares.—P.—¿No le explicaron en qué forma habían de cobrarse de esos mil dólares Félix Sánchez y de los mil quinientos Es-

teban?— R.—Esos mil pesos y los mil quinientos habrían de cobrárselos de la misma renta que produjera el edificio.— P.—¿Estaba arrendada esa panadería?—R.—La panadería no sé si estaba arrendada. Sé que había una tienda en el mismo edificio también.— P.—¿No sabe de quién era esa tienda?—R.—No, me parece que es del mismo que está allí, un tal Sixto.—P.—¿A cuánto asciende la renta de esa casa?— R.—Una panadería lo menos que renta aquí en Humacao son cien pesos.— P.—¿Pero Ud. no sabía si estaba arrendada ésa?— R.—Y ésa tiene, además, un sitio donde tiene una tienda que paga veinticinco pesos mensuales.— P.—¿Pero estaba o no estaba arrendada cuando eso?— R.—No sé.— P.—¿Ud. conoce la casa?— R.—La conozco.— P.—¿Acordaron ellos delante de Ud. algo con respecto a la forma en que se iban a hacer los gastos de reparaciones de esos edificios?— R.—No, en presencia mía no acordaron eso.— P.—¿No acordaron tampoco en presencia de Ud. quién había de cobrarse primero y en qué forma iban a disponer de la renta?— R.—No. El propósito era quedarse con la casa para todos después de pagarse la deuda.— . . . .''

Ignacio de Jesús, protocolista. Dijo que celebró una conferencia con Esteban Félix y Manuel Sánchez, y surgió el siguiente incidente:

''Lic. Vendrell: Un momento, Sr. Juez. Yo deseo que el compañero me diga primero cuál es el propósito de la declaración de este testigo.

''Lic. Aponte: El propósito de la declaración de este testigo es demostrar ante V. H. que con motivo de un procedimiento ejecutivo hipotecario que se seguía en la oficina del Lic. Francisco González Fagundo a nombre de doña Margarita Picornell contra los herederos de doña Juana Montañez, que son los demandantes y los demandados en esta acción, con excepción de doña Margarita que era la viuda de don Esteban, los interesados Esteban, Félix y Manuel fueron a la oficina de un Francisco González Fagundo al efecto de pagar o arreglar el pago de ese crédito hipotecario.

''Lic. Vendrell: Pues, Sr. Juez, me voy a oponer a que el testigo declare sobre este convenio o transacción habida entre el causante y los demandados porque el testigo está incapacitado para declarar sobre eso.

''Juez: La corte declara sin lugar la oposición.

"Lic. Vendrell: Tomamos excepción y antes de entrar en el examen de este testigo vamos a solicitar de su señoría, para que conste en récord, que ordene la eliminación de todas las declaraciones prestadas hasta ahora por todos los testigos que han declarado en este asunto, por entender que están comprendidas dentro de las disposiciones de la ley para prescribir quiénes son testigos hábiles y para derogar el art. 1215 del Código Civil de 10 de marzo de 1904.

"Juez: La corte declara sin lugar la moción eliminatoria por entender que ninguno de esos testigos es parte en el litigio. Puede seguir preguntando.

"Lic. Vendrell: Con nuestra excepción."

Continuó declarando "que dos o tres días antes de la subasta, que fué allá en diciembre del año 1929, Félix y Esteban Sánchez estuvieron donde el testigo a decirle que ya tenían conseguido el dinero y que pensaban entregarlo para evitar que se celebrara la subasta; . . . que el testigo les aconsejó a Félix y Esteban Sánchez que a ellos no les convenía entregar ese dinero y sí que se verificara la subasta, porque como había cuatro hijos fallecidos, además de la madre, porque así ellos adquirían un título limpio y sin grandes gastos, porque en declaratorias de herederos y otros documentos les iba a costar un capital, y parece que ellos, Esteban y Félix Sánchez, resolvieron aceptar lo que el testigo les aconsejó; . . . . . ."

Siguió el testigo declarando sobre la forma del reintegro de lo aportado por Esteban y Félix y fué extensamente repreguntado por el abogado de los demandados.

Agustín Díaz. Comenzó a declarar y ocurrió lo que sigue:

"Lic. Vendrell.—Lo trae también para encadenar la prueba relacionada con el mismo convenio que se alega en la demanda.

"Lic. Aponte.—Una admisión más.

"Lic. Vendrell.—Entonces vamos a levantar la misma cuestión con respecto a la inhabilidad de este testigo para declarar sobre estos extremos.

"Juez.—La corte resuelve lo mismo. La misma resolución.

"Lic. Vendrell.—Excepción.

"Juez.—Por entender que no es parte.

"Lic. Vendrell.—Con nuestra excepción."

Su testimonio corrobora la evidencia sobre el convenio de subastar la casa a nombre de uno para todos los herederos.

Félix Sánchez, uno de los demandantes, declaró con la oposición de los demandados que la panadería instalada en la casa en litigio era una de las mejores de Humacao. Preguntado sobre el convenio para la compra en la subasta, se opusieron los demandados y la corte sostuvo su oposición por tratarse de una parte en el pleito.

Preguntado sobre quién continuó en la posesión de la finca después de subastada, el testigo contestó, con la objeción de los demandados desestimada por la corte y su excepción:

"T.—La Sucesión de Juana Montañez, y le pagaban a Rosalía Sánchez, el que tenía arrendada la casa para una tienda que está en la esquina.

"Lic. Aponte.—¿Cómo se llama ese individuo?

"T.—Felipe Silva.

"Lic. Aponte.—¿Cuánto pagaba Silva por ese pedazo que tenía arrendado?

"T.—$25.

"Sigue declarando el testigo que el Sr. Silva sigue viviendo en el mismo sitio y que ahora le paga a la sucesión de don Esteban Sánchez.

"Lic. Aponte.—¿Quiere decir que antes de ponerlos el márshal en posesión, le pagaba a doña Rosalía Sánchez, y después que el márshal los puso en posesión le pagaban a la Sucesión de don Esteban Sánchez? ¿Es eso lo que usted quiere decir?

"T.—Sí, señor."

Con la objeción y excepción de los demandados se le permitió que contestara que las reparaciones de la casa las pagaban entre el testigo y Esteban.

Preguntado sobre si después de la muerte de Esteban Sánchez habló con sus herederos sobre el asunto, contestó:

"Sobre el asunto ese de la deuda que tenía la Sucesión de Juana Montañez con la de Esteban Sánchez y con lo que él había aportado para la ejecución de la finca descrita.

". . . habló con doña Margarita, o sea la viuda de don Esteban Sánchez y que ella requirió al testigo para que le pagara los $1,500 aportados por Esteban Sánchez para la finca.

". . . que al requerirlo doña Margarita para que buscara los $1,500, el testigo le contestó que harían todas las diligencias para conseguirle el dinero; que en vista que no pudieron conseguir el dinero doña Margarita le dió el asunto a don Francisco González Fagundo para que le cobrara a la sucesión; que el testigo no ha pagado los $1,500.

". . . que don Francisco González Fagundo como abogado requirió al testigo en nombre de doña Margarita Fuentes para que le buscara el importe de los $1,500 aportados por Esteban Sánchez para la finca; que el testigo le dijo al Lic. González Fagundo que buscaría el dinero; que después doña Margarita Fuentes Vda. de Sánchez se negó a recibir el dinero y le dijo que ella tenía cuatro hijos mayores y lo que querían ellos era la casa."

Rafael Mas, márshal de la corte de distrito, declaró que el precio de la subasta de que se trata le fué pagado mil cuatrocientos dólares en cheques y mil cien en efectivo, que mil salieron de Félix Sánchez, se los entregó él, Esteban le pagó mil cuatrocientos en los cheques y cien en efectivo. Mientras declaraba el testigo el abogado de los demandados dijo "Que conste nuestra oposición y nuestra excepción." Luego le repreguntó extensamente.

Para sostener que los errores uno al siete se cometieron invocan los apelantes la ley de 1904 decretada para prescribir quiénes son testigos hábiles y para derogar el artículo 1215 del Código Civil, Leyes de 1904, pág. 121, y las decisiones de esta corte en los casos de *Wilcox* v. *Axtmayer,* 23 D.P.R. 343 y *De la Rosa* v. *Sucesión Quevedo,* 47 D.P.R. 175. Y para impugnar los dichos señalamientos de error descansan los apelados en que los apelantes están impedidos de invocar la ley de 1904 porque no excepcionaron debidamente a tiempo la evidencia.

En la primera de las decisiones citadas por los apelantes se resolvió:

"La sección 3 de la ley prescribiendo quiénes son testigos hábiles y derogando el artículo 1215 del Código Civil y demás leyes, órdenes y decretos que se opusieren a la misma, aprobada en 10 de marzo de 1904 (Leyes 1904, pág. 121), no ha sido derogada expresamente por la Ley de Evidencia de 9 de marzo de 1905 (Leyes 1905, págs. 86–143), ni está en conflicto con ella."

"En la actualidad en Puerto Rico una parte en un pleito instituído contra los herederos o representantes legales de un finado por virtud de transacciones habidas con éste, no puede declarar como testigo, sin antes ser llamado por la parte contraria." *Wilcox* v. *Axtmayer* 23 D.P.R. 343.

Y en la segunda:

"Pero existió una objeción más fuerte. Al solicitar el consentimiento de la parte demandada para que declarara el demandante, su abogado se expresó textualmente como sigue:

" 'Anunciamos, señor Juez, que ofrecemos como prueba ahora el testimonio del demandante don Victorio de la Rosa, a fin de colocar a la parte demandada en condiciones de poder repreguntarle en relación con todo lo que ocurrió en la transacción de que se trata, conscientes como somos de que no podemos utilizarlo como testigo nuestro a menos que la parte contraria dé su consentimiento para ello; y ahora pedimos el consentimiento de la parte contraria para que declare el testigo, porque de otro modo Su Señoría no tiene más remedio que rechazar ese testimonio de acuerdo con la teoría establecida en el caso de *Wilcox* versus *Axtmayer et al.,* tomo 23 de las Decisiones de Puerto Rico, página 343.'

"En el caso citado se sostiene que está aún en vigor la sección 3 de la Ley para prescribir quiénes son testigos hábiles, aprobada en 1904, que dice:

" 'En las demandas por o en contra de los albaceas testamentarios, administradores o tutores en las cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, o relaciones hechas por el testador, intestado o pupilo, a menos que fuere llamado a declarar por la parte contraria; y las prescripciones de esta sección se aplicarán a todas las demandas por o en contra de

los herederos y representantes legales de un finado, que se suscitaren de transacciones habidas con éste.'

"Y si se reconoce por el propio demandante apelado que él personalmente no pudo declarar sobre el extremo indicado, claro es que no puede hacerlo tampoco por medio de otros testigos que refieran sus manifestaciones.

"Como se dice en 22 C. J. 217, 'Prueba de referencia no se convierte en admisible debido al hecho dé que el declarante ha salido del estado o país o se halla enfermo o no puede ser examinado y se ve obligado a declarar o no le es permitido declarar como testigo.' " *De la Rosa* v. *Sucn. Quevedo,* 47 D.P.R. 175, 183.

De suerte que lo más lejos que ha ido la jurisprudencia hasta ahora sobre el particular en esta jurisdicción es a que de acuerdo con la ley indicada ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, e relaciones hechas por el testador, intestado o pupilo, o en las demandas por o en contra de los herederos y representantes legales de un finado que se suscitaren de transacciones habidas con éste, sin que pueda tampoco dicha parte hacerlo por medio de otros testigos que se refieran a sus propias manifestaciones. Debe llamarse la atención hacia el hecho de que el resumen en el caso de *De la Rosa* v. *Sucn. Quevedo,* supra, es más amplio de lo que el texto de la opinión, en la parte que dejamos transcrita, permite.

De suerte que aplicando la propia jurisprudencia invocada por los apelantes debe resolverse que si bien excluye lo declarado por los testigos en relación con lo dicho por los demandantes Félix y Manuel Sánchez, no impide que las manifestaciones hechas por el causante Esteban Sánchez en contra de su interés según lo declarado por los testigos que no son partes en el pleito puedan ser tomados en consideración para su fallo por la corte.

En el caso de *Lezcano* v. *Sucesión Sifonte,* 42 D.P.R. 400, 402, esta propia corte por medio de su Juez Asociado Sr. Texidor se expresó así:

"Providencia Díaz Llenza no es una de las partes en el caso; ni siquiera la representante legal de su hija, la demandante, que está

representada por su padre con patria potestad. La circunstancia de que la suma de que se trata fuere regalada por ella a su hija, y puesta a nombre de ésta en su cuenta de ahorros en el Banco Territorial está perfectamente explicada; y no da a la declarante el carácter de parte en el caso, que se ha instituído, se ha tramitado, y se ha decidido, por Patria Monserrate Lezcano.

"La decisión en el caso *Wilcox* v. *Axtmayer et al.* (23 D.P.R. 343) que se cita por el apelante no le es en realidad favorable. Allí se discute y resuelve si *una parte* en un pleito contra los herederos de un finado puede declarar respecto a ciertos extremos, sin ser llamado como testigo por la otra parte. No es éste el caso actual."

Véase además el estudio que sobre la limitación contiene la opinión de esta corte emitida por su Juez Asociado Sr. Córdova Dávila en el caso de *Colón* v. *Sucn. Tristani,* 45 D.P.R. 227, 229.

En cuanto a que de no ser objetada las declaraciones de que se trata serían admisibles, no hay duda alguna. Resolviendo esa cuestión esta propia corte en *Cestero* v. *Sucn. Cestero,* 35 D.P.R. 991, 993, por medio de su Juez Asociado Sr. Wolf, dijo:

"La apelante está equivocada al suponer que la inhabilidad (*incompetency*) de un testigo según la sección 3 de la Ley de 1904 es absoluta. El estatuto mismo demuestra que puede ser fácilmente renunciado si el testigo es llamado por la parte contraria. Y las decisiones demuestran generalmente que puede renunciarse a esta clase de inhabilidad, al igual que a declaraciones de referencia, al estatuto de fraudes y a otras muchas causas de inhabilidad (*incompetency*)."

¿Se objetaron las declaraciones de González Fagundo, López del Valle y de Jesús? Se objetaron en efecto pero la primera por "inmaterial" y la segunda por "inmaterial y además de referencia." La tercera, al comenzar, por "incapacitado" siendo entonces que se pidió la eliminación a virtud de la ley de 1904, eliminación que estuvo limitada a las dos primeras. Siguió declarando De Jesús y la parte final de su declaración no fué objetada y sabemos lo que contestó en repreguntas. Luego se siguió invocando la ley más o

menos formalmente, repreguntando siempre el abogado de los apelantes los testigos.

En el caso de *Fagan* v. *Lentz,* 156 Cal. 681, se resolvió que "cuando una objeción a un testimonio sobre la base de que es inmaterial, irrelevante e incompetente por razones específicas se deniega propiamente, otro motivo a su admisibilidad, que no se levantó en la corte inferior, no puede urgirse en apelación." Aplicada estrictamente esa regla a las declaraciones de González Fagundo y López del Valle haría que no pudiera invocarse ahora en contra de ellas la ley de 1904, pero aunque así no fuera existe algo más que elimina la restricción y es que al dejar de impugnar gran parte de los testimonios que versó sobre la existencia y condiciones del convenio alegado en la demanda y al entrar voluntariamente en el trámite de repreguntas alrededor del mismo, los demandados abandonaron su oposición, encontrándose ahora impedidos de hacer valer sus objeciones.

Por el noveno error se sostiene que el juez apreció la evidencia con pasión, prejuicio y parcialidad y que la sentencia es contraria a la prueba.

Del examen que hemos hecho de los autos no encontramos rastro alguno de pasión, prejuicio o parcialidad por parte del juez sentenciador. Del tono de su opinión tampoco se desprende. Al contrario, lo que surge es su deseo de acertar y hacer justicia. Expresamente hizo constar en ella que no tomaba en consideración para formular sus conclusiones la evidencia admitida en contra de la ley de 1904 y la jurisprudencia de esta corte, yendo así más lejos de lo necesario, excepción hecha del testimonio del demandante Félix Sánchez, en relación con transacciones celebradas con su hermano fallecido Esteban causante de los demandados.

Dió entero crédito a las declaraciones de González Fagundo, López del Valle y De Jesús y a las otras que conocemos y la verdad es que creídos esos testimonios unidos a la prueba documental demostrativa de la procedencia del dinero para la subasta obtenido por los hermanos Félix y

Esteban en la exacta forma que los testigos expresan y tomada en consideración además la declaración del demandante Félix Sánchez en lo que respecta a las admisiones de Margarita Sánchez no rebatidas por ésta, no es posible concluir que la sentencia no esté sostenida por la prueba. Lo está, y ampliamente en verdad.

■ El décimo error levanta la cuestión de la nulidad de la sentencia por haberse dictado a sabiendas de que una de las demandantes, Ascensión Sánchez Montañez, había fallecido después de iniciado el pleito.

Se invoca al argumentarlo el artículo 69 del Código de Enjuiciamiento Civil y el caso de *Hernández* v. *Hutchison,* 20 D.P.R. 517. La cuestión no fué suscitada en la corte de distrito. La muerte de la dicha demandante cuyos intereses son enteramente afines a los de los otros demandantes surge de ciertas manifestaciones hechas por el testigo López del Valle en el curso de su declaración no con ese propósito específico y no consta que se le llamara sobre ella la atención a la corte ni que fuera tomada en cuenta, ni advertida siquiera por la misma.

Siendo ésas las circunstancias que concurren nos parece que están en lo cierto los apelados al impugnar el señalamiento de error a base de no haberse levantado la cuestión en la corte inferior. La acción no termina a virtud del fallecimiento de la parte y de haberse suscitado la muerte de que se trata pudo a tiempo seguirse el procedimiento marcado por el propio artículo del Código de Enjuiciamiento Civil que se invoca, el 69.

■ Estudiado el recurso como lo hemos hecho en su totalidad estamos en perfectas condiciones de decidir que la corte no erró ni abusó de su discreción al imponer a los demandados el pago de las costas y honorarios de abogado, especialmente cuando presentada evidencia sobre el conocimiento del convenio y sobre la actuación de los demandados en armonía con el mismo tratando de recobrar el dinero que su causante adelantó, no fué rebatida específicamente pudiendo

serlo si Margarita Sánchez hubiera declarado y se hubiera llamado a la silla de testigos para interrogarlo sobre tal extremo al abogado González Fagundo.

█ Decidido el recurso interpuesto por los demandados procederemos al estudio y resolución del establecido por los demandantes.

Se funda en un solo señalamiento de error, a saber, que la sentencia debe ser modificada en el sentido de que el pago de los frutos lo sea desde diciembre 28, 1929, y no desde enero 24, 1931. Se argumenta por los apelantes como sigue:

"En la demanda pedían los demandantes que se cumpliera el acuerdo entre los interesados, a saber: que las cantidades prestadas por don Esteban y don Félix Sánchez se pagaran con las rentas a razón de $100 mensuales, según el convenio; pero como la corte inferior no aceptó la declaración de don Félix Sánchez por ser parte en el litigio y prohibirlo el estatuto, la sentencia se limitó a reconocer la deuda y ordenar su pago desde el día de la subasta, 28 de diciembre de 1929, pero LIMITÓ el pago de las rentas o frutos a los interesados a partir del 31 de enero de 1931 solamente. Es decir, que desde una fecha hasta la otra (año y un mes) los demandantes no van a tener rentas, no obstante producir el inmueble $100 mensuales por la panadería, $25 por el otro local destinado a tienda, y no sabemos cuánto por la parte destinada a vivienda (por no decirlo el récord), mientras que tendrán ellos que pagar los intereses por todo ese lapso de tiempo."

Creemos que la sentencia no debe modificarse. La evidencia no esclarece a satisfacción del juzgador lo que exactamente ocurrió entre la fecha de la subasta y la de la entrega formal de la posesión de la casa a los demandados. Hay indicaciones en ella de que las rentas se entregaban a doña Rosalía una de las demandantes. En ese período fué que ocurrió la súbita muerte de Esteban origen de toda esta contienda familiar con sus necesarias implicaciones de trastornos administrativos. Y que la posesión de los demandados se compartía o se discutía y entorpecía por lo menos por los demandantes lo prueba el hecho de haber pedido los demandados a la corte que ordenara a su márshal que se la entregara

formalmente. La responsabilidad de los demandados en cuanto a la entrega del producto de la finca para ser repartido en la forma que se establece en la sentencia sólo es indiscutible a partir de esa toma de posesión o sea desde enero 24, 1931.

A virtud de todo lo expuesto *deben declararse sin lugar ambos recursos y confirmarse en todas sus partes la sentencia apelada.*

El Juez Asociado Sr. Todd, Jr., no intervino.