Luciano Alicea, menor de edad, representado por su madre Carmen Alicea, demandante y apelante, *v.* Emilio Antuñano, demandado y apelado.

Núm. 7014.—*Sometido:* Diciembre 4, 1936. *Resuelto:* Febrero 17, 1937.

*Angel A. Vázquez,* abogado del apelante; *Juan B. Soto y Enrique Igaravídez,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO, emitió la opinión del tribunal.

Se alega en la demanda que el menor demandante se encuentra bajo el cuidado y patria potestad de su madre Carmen Alicea; que ésta vivió en concubinato y sostuvo relaciones maritales en Río Piedras con el demandado Emilio Antuñano con quien procreó un hijo, el demandante, que nació el 6 de julio de 1910; que Carmen y Emilio durante sus relaciones y al tiempo de la concepción y nacimiento de Luciano eran solteros y podían casarse justamente, sin dispensación; que Emilio tenía pública y privadamente por su hijo a Luciano y le llamaba tal en conferencias con distintas personas, y que Carmen fué conocida viviendo en concubinato con el demandado durante la concepción, embarazo y nacimiento del demandante, siendo el demandado el único hombre con quien tuvo relaciones maritales.

Excepcionó la demanda el demandado por falta de hechos constitutivos de una causa de acción y su excepción fué declarada sin lugar. Contestó negando todos y cada uno de los hechos de la demanda y trabada de tal modo la contienda fué el pleito a juicio.

Presentó el demandante una certificación acreditativa de la inscripción de su nacimiento en el Registro Civil. De ella resulta que nació en la fecha alegada en la demanda, julio 6, 1910. Introdujo entonces los testigos Luciano Alicea, Carmen Alicea, Isabel Hernández, Aurelio Ramos, Benito Díaz, Reyes Alicea y Genaro Martínez.

Luciano, el demandante, declaró en resumen, que es hijo de Carmen, con quien siempre ha vivido, siendo su padre el demandado "que está allí sentado," señalándolo, que lo llevaba a la escuela en su automóvil varias veces y a quien pe-

día la bendición cuando con él se encontraba. Su padre le daba dinero, le hacía regalos y públicamente lo trataba como hijo suyo.

Carmen Alicea, substancialmente dijo que Luciano era su hijo, procreado con el demandado siendo ella una señorita de quince a dieciséis años de edad. Conoció al demandado en 1909, en su finca de Río Piedras, adonde fué a asistir a su madre enferma. A poco de llegar, comenzó a enamorarla. Se entregó a él. Ambos eran solteros. A los seis meses de relaciones, salió encinta. Vivían en una habitación que quedaba detrás de la casa de Aurelio Ramos. Él iba constantemente donde ella de día y de noche. En el cuarto dormían la siesta y él se quedaba algunas noches. Antuñano le pasaba de un peso a peso y medio diarios. Cuando salió encinta la llevó a otra finca a la casa de León Figueras, donde continuaron viviendo públicamente como marido y mujer y allí dió a luz a Luciano. Algún tiempo·después la llevó de nuevo a la casa de Ramos. Luciano tenía ya seis meses y el demandado continuó viviendo públicamente con ella como marido y mujer. Llamaba a Luciano su hijo. A repreguntas del demandado contestó que tenía treinta y cinco años de edad y estaba en la actualidad casada con Gregorio Maldonado. "Cuando llevábamos relaciones amorosas en la finca, Emilio Antuñano tenía su residencia en Río Piedras, en la casa de sus padres, y se iba para allá a altas horas de la noche, después de dormir conmigo."

Isabel Hernández, tía del demandante, dijo que vivía desde 1908 con su esposo Aurelio Ramos, en la finca "Canta Sapos" que administraba el demandado. Su esposo era el mayordomo. Con ella vivía también su madre, que se enfermó, llamándose a su hermana Carmen, que tenía unos quince años de edad, para que la cuidara. Antuñano requirió a Carmen de amores y su esposo y ella les cedieron una habitación de la casa donde dormían la siesta y algunas noches, como marido y mujer. Como consecuencia de ello nació el demandante, pagando Antuñano los gastos del alum-

bramiento y reconociendo a Luciano públicamente como su hijo. Cuando el niño estuvo bastante grandecito, un día le preguntó al demandado que qué iban a hacer con él, resolviendo enviarlo a la escuela, encomendando Antuñano a la testigo que lo inscribiera como lo hizo con el nombre de Luciano Antuñano. Muchas veces éste llevaba y traía a la escuela a Luciano.

Aurelio Ramos, confirma en todas sus partes la declaración que acabamos de extractar. Sólo transcribiremos íntegra la parte que sigue de su testimonio:

"Antuñano y Carmen empezaron a llevar amores y como la casa que yo ocupaba tenía un cuartito atrás, allí se veían los dos todos los días, hasta que un día Antuñano me dijo: 'Déjeme ese cuartito ahí para vivir con esta muchacha,' y entonces todos los días cuando Antuñano volteaba la finca, él y Carmen dormían allí la siesta y algunas noches Antuñano se quedaba allí a dormir y se iba tarde en la noche."

Benito Díaz, a preguntas del demandante, contestó:

"Viví en la casa de Emilio Antuñano, que es aquél que está allí (señalando al demandado) y fuí su empleado en la finca 'Zapater,' trabajando en la caña. Allí vivía también León Figueras. Conocí a Carmen Alicea y a Antuñano viviendo como marido y mujer y en la casa de León Figueras."

Respondiendo a repreguntas del demandado:

"Antuñano no se ocultaba para decir que Luciano era su hijo y estaba muy contento porque decía que le había salido muy inteligente; y cada vez que lo veía lo abrazaba y lo besaba y decía que ése era su hijo (señalando al demandante) y todo el mundo por allí conocía a Luciano y lo tenía como hijo de Emilio Antuñano, pues eso era público."

Reyes Alicea, tío del demandante, declara que "sabía que Carmen y Antuñano vivían en concubinato y que de sus relaciones maritales nació Luciano," que Antuñano le decía "cuñado" y le recomendaba que tuviera cuidado con Luciano porque pensaba mandarlo a educar a España. Trataba a Luciano con mucho cariño y lo llamaba hijo públicamente.

Genaro Martínez, condiscípulo del demandante, dijo que muchas veces el demandado traía a Luciano a la escuela y lo recogía y se lo llevaba en su automóvil. Las veces que fué con ellos observó que el demandado trataba como a su hijo al demandante "pues Antuñano era su papá."

Al terminar de declarar ese testigo consta del récord lo que sigue:

"Como última prueba someto a la consideración de la Hon. Corte la evidencia de percepción del Juez, porque, en los casos de filiación se puede utilizar esa clase de evidencia cuando las partes se encuentran ante la Corte: están ante su señoría el demandado y el demandante y sometemos la prueba de percepción física de ambos para que lo tenga en cuenta su señoría al resolver finalmente su asunto."

La prueba del demandado consistió en su declaración y en las de los testigos A. García Ubarri y Guillermo Morales.

Dijo el primero que conoció a Carmen Alicea en la finca hacia los años 1908 ó 1909 y con ella sólo tuvo "las relaciones que tiene un principal con los empleados de las fincas y sus familiares." Administraba la finca y en ésta había una casa habitada por un tío de Carmen casado con Isabel Hernández. Nunca vivió bajo techo en casa alguna que viviera Carmen. Vivía en la casa de su padre, en el pueblo. No tuvo relaciones carnales con Carmen, ni ha realizado acto alguno de reconocimiento con respecto al demandante. No ha hablado con Reyes Alicea, ni con Benito Díaz ni con Isabel Hernández en relación con Luciano. A la pregunta: "¿Y Luciano Alicea es hijo de usted?," contestó: "No lo tengo por tal." Negó que hubiera llevado en su automóvil a Luciano y que hubiera encomendado a persona alguna que lo matriculara en la escuela.

Ubarri manifestó:

"Conozco a Emilio Antuñano, hemos sido vecinos toda la vida y vivo en la calle Georgetti, de Río Piedras, dos casas de por medio a la en que vive Antuñano. Nunca he conocido ningún hijo a Emilio Antuñano nada más que el que tiene ahora. Siempre he visto a Antuñano viviendo con sus hermanas, el padre don Tiburcio y su esposa de ahora."

Morales se produjo en igual sentido que Ubarri.

Con esa prueba como base declaró la corte de distrito la demanda sin lugar.

Apeló el demandante. Alega que la corte erró al apreciar la prueba y al dictar sentencia. El apelado en un bien trabajado alegato sostiene que la sentencia apelada es la única que puede pronunciarse en este caso de acuerdo con los hechos, la ley y la jurisprudencia. Como se le interrogara durante la vista del recurso sobre la influencia que pudieran tener en la decisión del litigio las decisiones de esta corte en *Colón* v. *Sucn. Tristani,* 44 D.P.R. 171 y 45 D.P.R. 227, presentó un alegato adicional en el que trata de fijar el alcance de dichas decisiones.

Comienza la corte sentenciadora la relación del caso y opinión en que funda su sentencia estableciendo, como así es en efecto, que la ley reguladora del caso está contenida en el artículo 189 del Código Civil revisado de 1902, que en lo pertinente dice:

"Art. 189.—El padre está obligado a reconocer al hijo ilegítimo en los casos siguientes:

"1.    .    .    .    .    .    .    .    .    .

"2. Cuando pública o privadamente le tenga por hijo suyo o le haya llamado tal en conversación, o se ocupe de su educación y sostenimiento.

"3. Cuando la madre fué conocida viviendo en concubinato con el padre, al tiempo del embarazo o nacimiento del hijo, o cuando éste haya nacido llevando sus padres relaciones amorosas."

Y seguidamente expresa:

"Consideramos probado que Carmen Alicea, madre del demandante, allá por el año 1909 vivía en San Juan, trabajando como sirvienta en la casa de don Amancio Pérez. La madre de Carmen a la sazón vivía con su otra hija, Isabel Hernández, esposa de Aurelio Ramos, en una finca denominada 'Cantasapo' en Río Piedras, administrada entonces por el demandado. La madre de Carmen enfermó y fué llamada ésta a San Juan para que viniese a 'Cantasapo' a la casa de su hermana Isabel a asistir a su madre. En aquella época Carmen era muy joven y Antuñano, que con mucha frecuencia tenía

que venir a la finca, la requirió de amores, entablaron relaciones amorosas, aunque no hay prueba de que existiese promesa de matrimonio, llegando a realizar actos carnales. Necesitando una casa donde poder celebrar Antuñano sus entrevistas con Carmen, pidió a Aurelio Ramos, agregado suyo y cuñado de Carmen, que le cediese una habitación en su casa para Carmen y así se hizo. Antuñano, que residía en el pueblo de Río Piedras con sus padres, algunas noches se quedaba a dormir en la habitación de Carmen y algunas tardes, cuando iba a voltear la finca dormía la siesta con Carmen en su habitación. Le pasaba un diario de $1.00 ó $1.50, pero no demuestra la prueba que él comiese alguna vez en la casa de Carmen, limitándose a quedarse allí algunas noches y dormir la siesta algunas tardes, pero conservando su hogar y residencia en el pueblo de Río Piedras en la casa de sus padres. Así continuaron las cosas hasta que habiendo quedado encinta Carmen, como a los seis meses de la concepción fué trasladada al barrio Sabana Llana de Río Piedras, a la casa de un tal León Figueras, donde Antuñano le consiguió una habitación que ocupaba Carmen en las mismas condiciones en que ocupó la de la casa de Aurelio Ramos. Viviendo en la casa de León Figueras nació el demandante. Allí continuaron la madre y el hijo algún tiempo, hasta que fueron trasladados otra vez a la casa de Aurelio Ramos en una finca denominada 'Zapater' y administrada por el demandado. Antuñano siguió visitando a Carmen hasta que se retiró cuando el niño tuvo dos años, más o menos. Desde entonces dejó de pasarle el diario.''

Analiza entonces la evidencia aportada por el demandante para probar las admisiones de paternidad a que se contrae el inciso 2 del artículo 189 del Código Civil Revisado y concluye que no le satisface por los siguientes motivos:

''En primer lugar, es muy improbable que un niño nacido y criado en el campo, rodeado de personas ignorantes como fué el ambiente en que se crió el demandante, a los ocho o nueve años de edad rehuse ir a la escuela porque entienda que debe llevar el apellido paterno y no el materno. ¿Qué podría preocuparle entonces al demandante que le llamasen Luciano Alicea o Luciano Antuñano?

''En segundo lugar, si el niño era tan inteligente, si era verdad que el demandado quería darle una buena educación y mandarlo a seguir estudios superiores a España, ¿no es también ilógico que el demandado esperase a que el niño tuviese ocho o nueve años y que

su tía Isabel le llamase la atención para entonces mandarlo a la escuela?

"En tercer lugar, ¿no es más que improbable que un padre que deja de pasar alimentos a un hijo al cumplir dos años de edad, cuando más los necesita, sea tan solícito y cariñoso que lleve al hijo regularmente a la escuela, a horas fijas, para que el niño que es saludable, no tenga que caminar uno o dos kilómetros a pie?

"Tampoco podemos estimar probado que el demandado hiciese las admisiones que se le imputan sobre la paternidad del demandante. Es increíble que el demandado cada vez que iba a la finca, sin que hubiese un motivo para ello, tuviese que decir a sus peones que Luciano era su hijo. ¿Para qué tenía que decirlo? ¿Para qué tenía que decir a Reyes Alicea, hermano de Carmen y tío de Luciano, que éste era su hijo, si él positivamente lo sabía, pues conocía las relaciones de Antuñano con su hermana desde su principio?

"Generalmente tales manifestaciones se hacen a personas amigas que realmente no están enteradas de ello o no conocen al hijo y el padre lo presenta como tal, cuando las circunstancias requieren que sí lo haga. Pero un hombre que tiene un hijo natural no lo publica en la forma en que pretenden los testigos del demandante. Además, ninguno de los testigos que sobre tal extremo han declarado, ha podido demostrar qué motivo indujo, qué causa movió al demandado a hacer tales manifestaciones.

"Sobre este segundo aspecto del caso, es decir, sobre las manifestaciones puestas en boca del demandado en relación con su paternidad, así como el hecho de llevar y traer al demandante a la escuela, la corte no cree al demandante ni a sus testigos, tanto por la manera en que sobre tal extremo declararon como por lo inverosímil de su declaración en lo que a tales extremos se refiere.

"La ley prohibe la investigación de la paternidad y por ese motivo exige que solamente pueda probarse la paternidad a los efectos de una acción de filiación, por los medios que específicamente determina le ley. En el presente caso, que se rige por el Art. 189 del Código Civil, incisos 2 y 3, vigente en la fecha en que nació el demandante, la paternidad sólo puede probarse por cualquiera de los siguientes medios:

"(a) Demostrando que la madre del demandante fué conocida viviendo en concubinato con el padre, al tiempo del embarazo o nacimiento del hijo, o cuando éste haya nacido llevando sus padres relaciones amorosas, o

"(b) Demostrando que el padre le tenga por hijo pública o privadamente, o le haya llamado tal en conversación o se ocupe de su educación y sostenimiento.

"De modo que de nada vale que el demandante tenga un parecido físico muy grande con el demandado, como efectivamente lo tiene. De nada vale que tengamos la convicción moral, como la tenemos, de que el demandante es hijo del demandado, si esta convicción no nos la ha producido una prueba que haya venido a nosotros en la forma y manera requerida por la ley."

Analiza la ley, adopta el criterio rígido de que el concubinato es "una relación igual a la de marido y mujer, *con la sola diferencia* que en el caso del matrimonio la unión está legalizada por la ley, mientras que en el concubinato no existe tal legalización," (itálicas nuestras), invoca el caso de *Gerena v. Suau*, 36 D.P.R. 170, 173, analiza el de *Román* v. *Sucesión Domich*, 30 D.P.R. 406, y concluye que no habiéndose probado el concubinato y no siendo robusta ni convincente, ni habiéndole merecido crédito la evidencia con respecto a los actos de reconocimiento por el demandado, procedía declarar y declaraba la demanda sin lugar.

Aceptando sin resolverlo que la evidencia que mereció entero crédito a la corte sentenciadora no demostrara un verdadero caso de concubinato, aun así, estamos convencidos de que a la luz de la última jurisprudencia establecida en las citadas decisiones en el caso de *Colón* v. *Sucn. Tristani,* supra, el error cometido por la dicha corte sentenciadora al apreciar la prueba es manifiesto.

Son principios que quedaron establecidos en las repetidas decisiones los que siguen:

"La investigación de la paternidad está autorizada en Puerto Rico, aun después de la enmienda al Código Civil en el año 1911." *Colón* v. *Sucn. Tristani,* 45 D.P.R. 227.

"Evidencia aislada de la paternidad, si bien no basta por sí sola para declarar la filiación natural basada en la posesión de estado, constituye, sin embargo, un elemento importante de prueba para ser considerado con otros actos relativos a dicha posesión de estado y junto con prueba de estos actos puede ser, y como en este caso, es

suficiente para dejar satisfactoriamente establecida la filiación del hijo que la reclama fundado en tal posesión de estado.

"Cuando de la prueba aparece que en la fecha de la concepción del hijo la madre era la querida del padre putativo; que éste visitaba a aquélla con frecuencia, que le daba dinero y pagaba la casa; que él pagó los honorarios de la comadrona que asistió a la madre en su alumbramiento y que realizó algunos actos aislados de cariño hacia el hijo, tales hechos, unidos a otros detalles y circunstancias diseminados por la prueba son bastantes a declarar al demandante hijo natural reconocido del demandado." *Colón* v. *Sucn. Tristani,* 44 D.P.R. 171."

Y esos principios establecidos vigente la Ley núm. 73 de 1911 (Leyes de 1911, p. 248), son con mayor fuerza aplicables a este caso que se rige por una ley que no exigía para obligar al padre al reconocimiento, la posesión continua del estado de hijo natural sino meramente que el padre pública o privadamente tuviera al hijo como suyo o le llamara tal en conversación o se ocupara de su educación y sostenimiento.

Que el demandante es hijo del demandado, surge de los propios hechos que declaró probados la corte de distrito, palpita en la relación del caso y opinión de dicha corte desde el principio hasta el fin.

Y si ese hecho básico, substancial, es evidente, entonces no debe parecer extraño, inverosímil, que el demandado realizara los actos de reconocimiento que le atribuyen los testigos del demandante. Lo extraño, lo inverosímil sería que hubiera actuado de otro modo.

Según la prueba admitida como cierta, Antuñano, que era entonces muy joven, requirió de amores a la niña de quince años que fué a la finca que administraba y gozó de ella; sin ocultarse pidió a su mayordomo que le dejara una habitación en su casa para encontrarse a solas con su amante; cuando ésta salió encinta, la trasladó a otra finca sujeta también a su control; allí la sostuvo, allí nació su hijo y allí a las claras continuaron las relaciones entre ambos hasta que el niño tuvo dos años. Lo natural, lo lógico es que el padre actuara como tal en relación con su hijo, que hijo lo llamara y como a hijo lo acariciara y pensara en su porvenir.

Es después, cuando pasan los años, cuando Antuñano contrae matrimonio y surgen los intereses encontrados que su actitud varía. Y ello es también conforme a la experiencia humana.

Además, ¿qué base tuvo la corte sentenciadora para dejar de creer a los testigos con respecto a los actos de reconocimiento? Conocemos la evidencia aportada por el demandado. Las declaraciones de Ubarri y Morales son perfectamente compatibles con la evidencia del demandante. Todo lo que los testigos del demandante dijeron que ocurrió pudo en efecto ocurrir sin que tuvieran necesariamente que enterarse de ello los testigos del demandado y con respecto a la negativa de éste en cuanto al reconocimiento no vemos qué crédito pudo merecer a la corte cuando ella misma no se lo dió en cuanto al hecho esencial de sus relaciones con la madre del demandante.

El descrédito, pues, de la prueba del reconocimiento se basa únicamente en la impresión que los testigos del demandante produjeron al juez sentenciador en esa parte de sus declaraciones, no obstante haberles merecido crédito en la otra parte de las mismas; en lo inverosímil de sus dichos, según el propio juez expone.

Sucede en muchas ocasiones que los testigos exageran, que abultan los hechos, que dicen más, especialmente en casos de esta naturaleza, de lo que realmente aconteció, pero ello no quiere decir que sus testimonios en lo substancial no sean ciertos.

Además, ¿qué de extraño tiene que el demandante, no obstante su corta edad y vivir en el campo, aspirara a llamarse como su padre? Asombra a veces en la realidad la precocidad de los niños.

¿Y por qué considerar ilógico que fuera la tía Isabel la que tuviera que llamar la atención del padre sobre el ingreso de su sobrino en la escuela no obstante reconocer el padre que se trataba de un niño inteligente? Ya el padre no vivía junto al hijo, otros intereses se habían interpuesto entre ellos.

Se explica que en ciertos momentos al acercarse a él, al hablar sobre él, renaciera su afecto y sintiera el natural impulso de cumplir su deber, y que se entibiara luego su resolución al separarse y medir el alcance y las consecuencias de sus actos desde el otro hogar que legítimamente había formado. No así la tía en su actuación. Su afecto constante, sin trabas, la llevaba a persistir, llamando en toda ocasión favorable a la conciencia del padre, logrando que éste hiciera si no todo, algo de lo que debía.

La falta por parte del padre de su deber de alimentar al hijo, ya crecido, no es caso raro en verdad, aun tratándose de hijos legítimos, y las admisiones repetidas hechas ante trabajadores, nada tiene de inverosímil, si se recuerda la juventud del padre y la intimidad que en el aislamiento lleva consigo la vida campesina.

Tras un estudio detenido del caso, la convicción que hemos formado es tan fuerte, que nos obliga a concluir que aquí se ha presentado la prueba robusta que la jurisprudencia exige, habiendo cometido el juez sentenciador el manifiesto error que se le imputa al apreciar la misma, y en tal virtud que debe decretarse el reconocimiento. *En su consecuencia, procede revocar la sentencia recurrida y dictar otra declarando la demanda con lugar, con imposición de las costas al demandado.*

El Juez Presidente Señor del Toro no intervino.

El Juez Asociado Señor Wolf disintió. *