José Antonio Antonetti, demandante y apelado, *v.* Eugenio Fernández García, hoy su Sucesión, etc., demandados y apelantes.

Núm. 9525.—*Sometido:* Junio 2, 1947. *Resuelto:* Marzo 19, 1948.

R. *Cuevas Zequeira, Lionel Fernández Méndez* y *M. Orraca Torres,* abogados de los apelantes; *Leopoldo Tormes García,* abogado del apelado.

Per Curiam: Este recurso se estableció contra la sentencia que declaró a José Antonio Antonetti hijo natural reconocido del Dr. Eugenio Fernández García y contra la resolución denegatoria de la moción de nuevo juicio. El señalamiento de errores va dirigido virtualmente contra la apreciación de la prueba y la resolución denegatoria del nuevo juicio.

La prueba es contradictoria. La que creyó la corte sostiene su conclusión al efecto de que el demandante se hallaba en la posesión continua del estado de hijo natural del padre demandado. El caso se halla en la línea fronteriza a tal extremo, que una sentencia de la corte inferior en sentido contrario, hubiera sido confirmada por este Tribunal, teniendo en cuenta aquella parte de la Regla 52 de las de Enjuiciamiento Civil que dice así:

"Las conclusiones de hecho basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas y se tomará en cuenta la oportunidad de la corte sentenciadora para juzgar de la credibilidad de los testigos."

En cuanto a la moción de nuevo juicio basada en el alegado prejuicio del juez sentenciador, luego de examinados los distintos incidentes a que se refiere dicha moción, no encontramos nada que tienda a demostrar pasión, pre-

juicio o parcialidad por parte del juez sentenciador. Y en cuanto al descubrimiento de nuevas pruebas concierne, bastará repetir lo dicho en la resolución denegatoria del nuevo juicio, a saber:

". . . no estamos convencidos de que la Sucesión demandada desplegara razonables diligencias con anterioridad al juicio para descubrir o hallar las mismas, especialmente si tomamos en consideración que entre la primera y segunda vistas celebradas transcurrieron seis días, durante los cuales la parte demandada, conocedora de la prueba del demandante y la que a su vez tenía a su disposición personas versadas en la búsqueda en los registros demográficos, pudo descubrir la nueva prueba en que ahora funda su alegado derecho."

*Procede, por lo expuesto, confirmar la sentencia apelada.*

El Juez Asociado Sr. Marrero se inhibió.

Opinión disidente emitida por el Juez Presidente Sr. Travieso.

Junio 11, 1948.

En la demanda interpuesta contra la Sucesión del Dr. Eugenio Fernández García, el demandante José Antonio Antonetti alega como primera causa de acción que Francisca Antonetti y el citado doctor, siendo ambos solteros y en condiciones para poder contraer matrimonio sin dispensa de clase alguna, sostuvieron relaciones amorosas en Salinas, Puerto Rico, allá por los años 1917 y 1918, como resultado de las cuales nació el demandante allá por el día 12 de mayo de 1918. Se alega además que Fernández García "alimentó siempre, acarició y se ocupó de la educación e instrucción del demandante, a quien trató como su hijo, pública y privadamente, y habiendo dicho demandante disfrutado de la posesión constante del estado de hijo natural de dicho don Eugenio Fernández García"; y que los demandados se han negado a reconocer al demandante como hijo natural de su causante. Como segunda causa de acción se alega que el causante dejó bienes que tienen un valor mayor de $500,000; que el demandante tiene derecho a participar de

dicha herencia como hijo natural del finado doctor Fernández García; y que los demandados no le han entregado su participación. Pide el demandante que se le declare hijo natural reconocido del finado, con derecho a llevar su apellido y que se condene a los demandados a entregar al demandante su participación en la herencia y al pago de costas y honorarios de abogado.

La Sucesión demandada contestó negando específicamente los hechos esenciales de la demanda.

Contra la sentencia dictada por la Corte de Distrito de San Juan, de acuerdo con la súplica de la demanda, los demandados han interpuesto el presente recurso. Los demandados han apelado también de la resolución de abril 7 de 1947 por la cual se denegó la moción de nuevo juicio por ellos solicitado.

Consideraremos primero el recurso interpuesto contra la sentencia, pues si el mismo prosperase sería innecesario entrar a considerar el segundo.

Los demandados apelantes imputan a la corte sentenciadora la comisión de ocho errores. Examinaremos en primer término los que están relacionados con la admisión de evidencia.

1. En la demanda no se hace alegación alguna en cuanto a que entre el doctor Fernández García y la madre del demandante existiera un concubinato. Alegan los apelantes que la corte a quo erró al admitir prueba de un supuesto concubinato. Hagamos un resumen de toda la prueba aducida por ambas partes.

La primer testigo, Francisca Antonetti, madre del demandante, declaró: Conoció al doctor Fernández García en la playa de Salinas; éste la enamoró en su casa en ocasión en que él fué a ver a su madre que estaba enferma; como al mes el doctor se la llevó para el pueblo de Salinas a "la calle Cayey a unos cuartos de Maximino Santiago" y allí le tenía una cama y todo lo necesario. Ella salió encinta; vivió

allí cinco meses. Todo esto ocurrió en el año 1917. A los dos meses de haberse ido con el doctor salió encinta. Luego el doctor se fué a trabajar para Fajardo y ella regresó a la playa de Salinas a casa de sus padres; y más tarde, el 12 de mayo de 1918, nació el niño. Como a los tres meses después de haber nacido el niño el doctor fué a la playa a verlo y a lleverle dinero; cuando el niño tenía siete meses ella fué a Fajardo a ver al doctor y llevó al niño y el doctor lo cogió y dijo: "no se puede negar." No volvió a ver al doctor hasta el 1931 cuando fué a la Clínica Fernández García en Hato Rey. No había visto al doctor durante todo ese tiempo (13 años) porque no sabía su paradero y lo fué a ver en el 1931 porque se enteró por los periódicos. En esta visita el doctor le dió $50, y le manifestó allí y entonces refiriéndose al niño "que iba a darle una educación y ayudarle a sus alimentos". Después de esta visita volvió a ver al doctor tres veces más acompañada por el chófer Rafael Garay y su hijo. El doctor siempre recibía al muchacho muy cariñoso y le daba dinero. El niño se educó en el colegio de Martiniano García, en Ponce, y el doctor atendía los gastos del colegio, ropa, etc., y le mandaba el dinero al muchacho por correo. Antes de tener relaciones con el doctor, ella era soltera, "una niña de 17 años."

En el contrainterrogatorio declaró: Que ella tiene otro hijo de Ramón Vázquez, el cual nació a los tres años de haber nacido José Antonio; que el doctor ayudó a José Antonio hasta que éste tuvo 3 años, pues le mandaba dinero con el hermano de ella Tomás Antonetti; que pasaron como diez años sin ella saber del doctor; tuvo a Vázquez como marido y luego a Donato Laboy; que no recuerda el nombre de la persona que la llevó a Fajardo, pero sabe que fué en automóvil; que se fué a vivir con el doctor en junio de 1917; que el doctor se fué para Fajardo cuando vinieron las elecciones del "coco y la botella"; que el doctor comenzó

a ayudar al demandante en el 1931; que ella fué a vivir a Ponce en 1921; que el niño nunca fué inscrito en el registro y fué bautizado en Ponce por Antonio Ortiz y Rufina Laboy.

Fidel A. Guillermety Ribas declaró: Que es auditor contador de la Clínica Fernández García; envió cartas y cheques a nombre de y por encomienda del doctor a José Antonio Antonetti; los sobres generalmente contenían cheques y otras veces cartas pidiéndole al demandante que enviara las notas de sus estudios y esto lo hacía por instrucciones del doctor; que esto se comenzó a hacer en el 1939. El testigo presentó 60 cheques enviados por él al demandante y fechados desde el 1939 en adelante.

Justo Santiago declaró: Que conoció al doctor en el 1917; que Francisca Antonetti vivía en un cuarto en casa de Maximino Santiago en la calle Cayey de Salinas y vivía allí con el doctor; que el doctor era el único que la visitaba e iba donde ella casi todas las noches; que el declarante tenía otra muchacha en otro cuarto de la misma casa y también iba a verla todas las noches; que el doctor vivía en el pueblo con su familia en casa de su cuñado don Pepe Rovira, con su mamá y su hermana; que Francisca salió encinta; que ésta vivió luego con Ramón Vázquez, y que el doctor se fué para Fajardo a fines de 1917.

Cornelio Alvarado declaró: Que el doctor se fué para Fajardo después de las elecciones del coco y la botella; que el doctor se llevó a Francisca para la casa de Maximino Santiago en la calle Cayey de Salinas; que ambos vivían allí como marido y mujer; que el doctor la visitaba allí; que ella salió encinta; que el doctor vivía en Salinas en la casa de su cuñado don Pepe Rovira y estaba allí regularmente; que Francisca Antonetti dió a luz en la playa de Salinas, un niño; que todo esto ocurrió en el 1917.

En el contrainterrogatorio declaró: que el doctor visitaba la casa de Maximino Santiago donde vivía Francisca, pero no puede decir a qué iba; que el doctor le confesó que él llevaba relaciones con Francisca; que el niño nació a mediados del año 1918.

Teófilo Pérez declaró: que el doctor era médico del pueblo de Salinas para el año 1917; que el doctor visitaba la casa de Francisca Antonetti en la playa con frecuencia; que Francisca se fué a vivir al pueblo a la calle Cayey en casa de Maximino Santiago y allí también el doctor la visitaba; que allí "en el período que fué a esa casa yo ví que la barriga se le iba aumentando"; que luego Francisca dió a luz en la playa a José Antonio.

En el contrainterrogatorio declaró: que Francisca estaba "encinta del doctor", porque él era el único que visitaba la casa; y que supone que el doctor la visitaba como amante y no como médico, porque como vecino que era presenció los preliminares cuando el doctor la enamoraba en casa de los padres de la muchacha.

Rafael Garay declaró: que se dedica a conducir automóviles públicos; que en el 1931 trajo en su automóvil a Francisca y José A. Antonetti desde Ponce hasta San Juan y los dejó enfrente de la clínica Fernández García, en Hato Rey; que los trajo dos veces más después de ésa, pero que al demandante solo lo trajo muchas veces; que en una ocasión el demandante le dijo al doctor "Papá, dame dinero para pagar el chófer"; que entonces el doctor sacó un billete de $5 y se lo dió para que cobrara.

José Antonio Antonetti declaró: que conoció al doctor en la Clínica Fernández García en el 1931, acompañado por su madre; que veía al doctor con frecuencia desde entonces; que recibió un sinnúmero de cheques enviádosle por el doctor "para pagarme los estudios y a la vez pagar los alimentos y ropa"; que él llevaba relaciones con el doctor de "padre e hijo"; que nunca fué empleado del doctor ni le

rindió servicio alguno y que recibía los cheques porque era su hijo; que el doctor lo trataba "como trata un padre a un hijo".

En el contrainterrogatorio declaró: Que estudiaba en Martínez Business College; que hasta que tuvo 13 años no tuvo relaciones con el doctor de ningún género; que el doctor lo ayudaba con dinero desde 1931 pero que fué en 1939 que comenzó a recibir cheques regularmente—fué·en este mismo año que ingresó en la escuela de comercio; que el doctor lo trataba con cariño y se "tuteaban"—sin embargo de las cartas que el demandante le escribió al doctor se desprende que esto no existía, pues el saludo de cada carta era de "Estimado doctor" y terminaba con "quedo, seguro servidor, José E. Antonetti"—; que recibió ayuda del doctor hasta el 1943, cuando se fué a trabajar a la Central Mercedita; que en ningún momento antes del fallecimiento del doctor Fernández García trató de obtener el reconocimiento debido y el apellido de su padre—no puede explicar porqué no ejerció su derecho entonces—; que al morir el doctor tuvo una entrevista con el doctor Fernández Cerra (hijo de Fernández García) y Rafael Fernández García (hermano del doctor Fernández García), pero no llegaron a un acuerdo; que cuando entró al ejército no puso al doctor como que era su padre; que el doctor descontinuó la ayuda en 1943 porque "me metí en política y a la vez me metí a trabajar en la central"; que nunca le pidió al doctor participación en sus bienes ni le solicitó ser reconocido; que fué a solicitar su parte en la herencia 17 días después del fallecimiento del doctor; que no estuvo en el entierro porque se enteró de la muerte muy tarde.

Nicolás Benítez declaró: Que conoció al doctor en Salinas y al demanante "casi desde que estaba en el vientre de la madre;" que Francisca vivía con el doctor en la calle Cayey para ese año; que el doctor era el único que visitaba a Francisca en ese tiempo; que Francisca vivió allí

hasta octubre de 1917; que vió al doctor en Ponce "como a los diez u once años de haberse ido para Fajardo, en la clínica del Dr. Pila" en ocasión en que se celebraba la inauguración de una nueva planta; que allí fué a saludar al doctor y entonces se presentó el demandante y le pidió la bendición al doctor ocurriendo lo siguiente:

"Yo lo saludé, entonces llegó el muchacho 'la bendición, papá', le echó el brazo por el hombro, le dijo 'Chico, ¿cómo van esos estudios?', 'Muy bien, papá.'

"P. ¿Qué más pasó allí si algo pasó?

"R. Entonces el muchacho le dijo '¿Papá, usted se va hoy? ¿Cuándo se va?' Y él le dice 'Pues yo me voy esta noche'. Entonces allí yo me desvié y ellos se quedaron atrás."

En el contrainterrogatorio declaró: Que el doctor vivía con su mamá en Salinas frente a la plaza Las Delicias, pero que en las horas de la noche "visitaba a la muchacha que tenía en la calle Cayey; que vió al doctor salir de la habitación de Francisca en la calle Cayey, en los *últimos días de octubre de 1917;* que el doctor se fué para Fajardo en noviembre de 1917.

Hasta aquí la prueba aportada por la parte demandante. Por el demandado declaró como primer testigo Rafael Modesto al efecto de que vino a declarar como testigo del demandante, pero no. lo llamaron; que envió un telegrama a Valentín Santiago al cuidado de Cruz Pacheco Ruiz, Sargento de Armas del Senado el día 14 de noviembre de 1946 que decía lo siguiente: "Pleito contra sucesión Fernández señalado veinte corriente fuerte prueba preparándose aquí. Si autorizan venga pronto gestionar transacción. Rafael Modesto." Explicó que el motivo por el cual envió el telegrama fué porque él creía que todo se podía arreglar sin necesidad de ir a la corte.

En el contrainterrogatorio declaró: que el doctor conoció a Francisca cuando muchacha y la galanteaba en la calle Cayey y en la playa para el 1917; que es supervisor de escuelas rurales en Salinas.

Valentín Jiménez declaró: que es hermano de Valentín Santiago; que el telegrama enviado por Rafael Modesto fué dirigido a él; que el doctor para el 1917 vivía en Salinas en casa de don Pepe Rovira; que cuando el doctor estaba en Salinas, el testigo lo acompañaba en todos sus recorridos en calidad de ayudante; que el doctor salió para Fajardo en las últimas semanas de junio de 1917; que después que el doctor se fué para Fajardo nunca más regresó a Salinas; que se fué a trabajar con el doctor para Fajardo en enero 7, 1918; que nunca antes había visto a Francisca y José Antonetti, hasta ahora hace poco que los vió en Ponce; que el doctor nunca tuvo un hijo en Salinas ni vivió en concubinato con alguna mujer; que en 1920 el doctor lo envió a Michigan a estudiar con gastos pagos.

En el contrainterrogatorio declaró: que hizo investigaciones en relación con este asunto por encomienda de la sucesión del doctor Fernández García; que tiene que agradecerle muchos favores al doctor y su familia.

Eladio J. Candal declaró: que es contador público autorizado; que fué *assistant controller* de la Central Fajardo desde 1913 hasta 1921; que el doctor era médico residente de la compañía Fajardo Sugar Growers Association y que comenzó a trabajar como tal el día 1ro. de julio de 1917; que el doctor continuó allí hasta julio 31 de 1920.

En el contrainterrogatorio declaró: que fué a Fajardo en agosto 13 de 1946, a ver los records y así pudo cerciorarse con certeza de que el doctor había comenzado a trabajar en Fajardo el 1ro. de julio de 1917; esto lo hizo a solicitud de la sucesión Fernández García.

Fidel A. Guillermety Ribas declaró: que es auditor de la Clínica Fernández García; que ocupa esta posición desde 1930; que recibió órdenes del doctor para enviarle un cheque al demandante a principios de 1939; que comenzó a enviarle al demandante $8 mensuales; que este dinero se le enviaba para sus estudios; que esto duró hasta mediados de 1943;

que la cantidad máxima mensual enviada fueron $15; que el doctor prestaba ayuda similar a otras personas, como 35 ó 40 personas distintas; que el doctor en 1943 le ordenó que descontinuara la ayuda al demandante porque éste se estaba dedicando a la política y porque abandonó sus estudios.

El Dr. J. L. Montalvo Guenard declaró: Ejerció su profesión en Salinas desde 1916 hasta 1920; que el doctor vivía en casa de don Pepe Rovira con su mamá; que el doctor se fué para Fajardo en junio de 1917; que una vez se fué para Fajardo no regresó a Salinas; que no conoce al demandante ni tampoco le conoció mujer alguna al doctor mientras éste estuvo en Salinas.

Leopoldo Morera declaró: que ha residido en Salinas desde el 1916 hasta hace 12 años y nunca oyó decir que el doctor tuviese relaciones con ninguna mujer en Salinas; que el doctor vivía con don José Rovira para el 1917. En contrainterrogatorio declaró: que conoció a Francisca Antonetti desde niña; que ésta tenía una buena reputación; que no puede decir lo que el doctor hiciera por las noches mientras estuvo en Salinas porque el testigo no salía de su casa de noche.

José María Rovira declaró: que era hermano político del doctor; que el doctor para el 1916 vivía en su casa en Salinas; que el doctor estuvo viviendo allí hasta fines de junio de 1917, cuando se fué para Fajardo; que el doctor no estaba en Salinas para las elecciones del coco y la botella; que el doctor no tuvo relaciones de clase alguna con Francisca Antonetti ni que tuviera un hijo con ella.

Rafael Fernández García declaró: que es hermano del doctor; que para el 1916 y 1917 éste vivía en Salinas con su mamá en casa de José Rovira; que el doctor se fué para Fajardo en junio de 1917 y nunca más regresó a Salinas; que el doctor estaba en Fajardo cuando las elecciones del coco y la botella; que el doctor mientras vivió en Salinas

llevó una vida pulcra y muy de su casa; que nunca tuvo conocimiento de que su hermano tuviere relaciones con Francisca o alguna otra mujer; que conoció al demandante en la clínica en ocasión en que éste fué a reclamar su parte de la herencia; que el demandante le dijo que era hijo de su hermano; que en esa ocasión el demandante le enseñó una carta firmada por Guillermety (el auditor de la clínica) donde se le preguntaba por sus estudios; que el demandante le pidió que transara el asunto colocándolo en la clínica; que su hermano nunca le mencionó que tuviese hijo alguno en Salinas. En el contrainterrogatorio declaró: que el doctor era soltero cuando residía en Salinas.

Eugenio Fernández Cerra declaró: que es hijo legítimo del doctor; que conoció al demandante como a las dos semanas de muerto el doctor. El testimonio de este testigo se refiere al incidente cuando el demandante fué a la clínica a reclamar sus presuntos derechos.

Carmelina Cerra de Fernández García declaró: que es la viuda del doctor; que el doctor acostumbraba a ayudar económicamente a estudiantes necesitados, entre otros, al demandante y la sucesión ha seguido esta práctica; nombra algunas personas que fueron ayudadas por el doctor.

La demanda está basada en el artículo 125 del Código Civil, edición de 1930, el cual, en lo pertinente dispone:

"*Artículo 125.*—Son hijos naturales los nacidos fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella.

"*.

"El padre está obligado a reconocer al hijo natural:

"1.

"2. Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia.

"3. Cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo."

La prueba ofrecida por el demandante tendió a sostener las dos alegaciones esenciales de la demanda, o sean: (*a*) que el demandante fué concebido en el año 1917, cuando su alegado padre y su madre natural eran solteros y hubieran podido contraer matrimonio; y (*b*) que el alegado padre "alimentó siempre, acarició y se ocupó de la educación e instrucción del demandante, a quien trató como su hijo, pública y privadamente, y habiendo dicho demandante disfrutado de la posesión constante del estado de hijo natural de dicho Eugenio Fernández García."

La demanda no contiene alegación alguna al efecto de que la madre del demandante fuera conocida viviendo en concubinato con el Dr. Fernández García, durante el embarazo y al tiempo del nacimiento del niño. La evidencia admitida con la oposición de la parte demandada no fué ofrecida para probar el concubinato y sí las relaciones amorosas que se alega existieron entre los alegados padres del demandante. Más aún, esa prueba si algo demuestra es que Francisca Antonetti no vivía en concubinato con el alegado padre del demandante. La corte inferior no cometió error al admitirla.

2. Los señalamientos restantes están relacionados con la apreciación que de la evidencia hizo la corte inferior. Los consideraremos conjuntamente.

La prueba aducida por el demandante para establecer la paternidad del Dr. Fernández García es a nuestro juicio insuficiente. Con excepción de Francisca Antonetti, quien declaró en cuanto a las alegadas relaciones carnales entre ella y el Dr. Fernández García, todo lo que declaran los demás testigos del demandante es que el doctor, quien ejercía su profesión en el mismo pueblo de Salinas, visitaba la casa de Maximino Santiago, en la cual vivía Francisca Antonetti. Sobre lo que ocurriera dentro de la casa, nada vieron y nada saben dichos testigos. Sus declaraciones no son suficientes,

aun cuando sean creídas, para justificar la conclusión de que las visitas del doctor a la casa de Santiago no eran de carácter profesional y sí con el propósito de sostener allí relaciones amorosas con Francisca Antonetti.

La declaración de Francisca Antonetti en cuanto al hecho de la paternidad es en verdad deficiente e imprecisa. Dice que el niño nació el 12 de mayo de 1918. Si esto es cierto, la concepción debió tener lugar allá para el 12 de agosto de 1917. La prueba no contradicha de los demandados demuestra que el Dr. Fernández García trasladó su residencia al pueblo de Fajardo y empezó a trabajar allí como médico residente de la Fajardo Sugar Growers Association el día 1ro. de julio de 1917. El testimonio positivo del Sr. Candal y el del Dr. Montalvo Guenard, sobre el hecho del traslado del Dr. Fernández García a Fajardo a fines de junio de 1917, no habiendo sido contradichos y no siendo el hecho inverosímil ni físicamente imposible, debieron merecer crédito a la corte inferior. *Caballero* v. *González*, 53 D.P.R. 539; *Pedraza* v. *González et al.*, 66 D.P.R. 757. Es al demandante a quien incumbe probar que él fué concebido como resultado de relaciones sexuales habidas entre su madre natural y su alegado padre. No encontramos prueba alguna que demuestre que el doctor Fernández García visitara o tuviera relaciones sexuales con la madre del demandante en momento alguno durante los meses de julio y agosto de 1917, en uno de los cuales debió ser concebido el niño nacido el 12 de mayo de 1918. Se dirá que era posible que el doctor fuera desde Fajardo hasta Salinas a visitar a su amante, pero ésa es una mera conjetura carente de todo valor probatorio.

La corte inferior cometió manifiesto error al resolver que la alegada paternidad había sido establecida.

Asumiendo que dicho error no fué cometido, veamos si la prueba aducida por el demandante es suficiente para sos-

tener la alegación de "posesión continua del estado de hijo natural" del Dr. Fernández García, justificada por actos del alegado padre.

De acuerdo con la declaración de Francisca Antonetti, cuando el niño tenía 7 meses ella lo llevó a Fajardo a ver al doctor. El niño cumplió los siete meses de nacido el 12 de diciembre de 1918. Desde esa fecha hasta el año 1931 ella no volvió a ver al doctor porque no sabía su paradero. En 1931 se enteró por los periódicos del paradero del doctor y entonces fué a verlo y el doctor le dió $50. Fué ocho años más tarde, en mayo de 1939, cuando el demandante tenía 21 años de edad, que el doctor empezó a enviar al demandante $15 mensuales para pagar sus gastos de educación en una escuela de comercio en Ponce. Esos pagos terminaron cuando el demandante abandonó sus estudios para dedicarse a la política.

La norma establecida por el Tribunal Supremo en *Torres v. Sucesión Caballero,* 39 D.P.R. 724, 729, es aplicable al caso de autos. Al confirmar la sentencia desestimando la demanda, el Tribunal, por voz del Juez Asociado Sr. Aldrey, se expresó así:

"Para analizar tal prueba hay que tener en cuenta algunas circunstancias concurrentes en casos como el presente. Desde luego, cuando se trata de obtener la declaración del *status* de hija natural de un padre que ha fallecido la prueba debe ser estudiada y considerada con mucho cuidado y hasta con cierto recelo, pues la persona a quien se imputan determinados actos de reconocimiento no puede defenderse de ellos y son generalmente sus parientes, desconocedores muchas veces de la vida íntima del difunto, los que han de defenderle de la imputación de tales actos, sin otra prueba, generalmente, que la negativa. Además, suele ser sospechoso que a pesar de haber transcurrido un gran número de años, en este caso unos diez y seis años, sin que se atribuya al presunto padre actos de reconocimiento y más bien un abandono de ellos, sin embargo se esperó su muerte para entonces demandar a los que han de recibir sus bienes. Y en todo caso siempre hay que tener en cuenta que la prueba de los actos de reconocimiento debe ser robusta y convin-

cente, según hemos declarado en varias ocasiones, y que no debe ser de actos aislados sino en tal modo que demuestren la posesión continua del *status* de hijo natural del presunto padre o de su familia, sin que tengan que ser ininterrumpidos durante toda la vida del hijo reclamante.''

Conviene hacer constar que la prueba, tanto de la paternidad como de la posesión del estado de hijo natural, en el caso de *Torres* v. *Sucesión Caballero,* según el resumen que de ella se hace en la opinión, era mucho más robusta y convincente que la ofrecida en el presente caso. En los casos de *Colón* v. *Sucn. Tristani,* 44 D.P.R. 171 y 45 D.P.R. 227, y *Alicea* v. *Antuñano,* 50 D.P.R. 923, citados por el demandante apelado, la prueba del concubinato y de los actos de reconocimiento era tan robusta y convincente que no dejaba duda alguna en cuanto a la filiación que se solicitaba.

La evidencia en cuanto a la alegada posesión continua del estado de hijo natural no tiene en este caso ni la robustez ni la fuerza de convicción necesarias para cumplir con la regla establecida por la jurisprudencia que hemos citado. Aquí, como en *Torres* v. *Sucesión Caballero,* supra, el demandante esperó 28 años, desde su nacimiento hasta la muerte de su alegado padre, para entonces demandar a los que han de recibir sus bienes. La prueba si algo demuestra no son actos de reconocimiento y sí un abandono de ellos. La misma madre del demandante declara que desde el año 1918 hasta el 1931 ni ella ni el niño vieron al doctor ni recibieron nada de él. El resto de la prueba se refiere a actos aislados, sin fijar la fecha de los mismos. Es cierto que la prueba documental ofrecida por el demandante demuestra que durante un número de años el Dr. Fernández García ayudó al demandante con la suma de $15 mensuales para pagar por su educación en un colegio comercial. Empero, ese hecho, admitido por los demandados, no es por sí solo suficiente para poder basar en él una declaración de filiación a favor del demandante, toda vez que la prueba aducida por los demandados y no contradicha demostró que el

Dr. Fernández García ayudaba en la misma forma a un buen número de estudiantes pobres. Las cartas escritas por el demandante al doctor demuestran que la ayuda que aquél recibía no era como hijo y sí como un protegido, pues en ellas el demandante expresa su agradecimiento y ofrece devolver las sumas recibidas cuando esté en condiciones para poder hacerlo.

Por las razones expuestas el suscribiente opina que la corte inferior cometió manifiesto error en la apreciación de la prueba, que ésta es insuficiente para sostener la demanda y que la sentencia recurrida debió ser revocada y en su lugar debió dictarse otra desestimando la demanda con imposición de las costas al demandante.